**STATE OF UTAH and the Board of Trustees of the Utah Navajo Trust Fund, Plaintiffs,**

**v.**

**Bruce BABBITT,[1] the Department of the Interior, and the Bureau of Indian Affairs, and the Navajo Area Director, Bureau of Indian Affairs, Defendants,**

**Navajo Nation and Chuska Energy Co., Intervenors.**

**No. 92–C–376G.**

United States District Court, D. Utah, C.D.

July 20, 1993.

---

**1.** This case originally named Manuel Lujan as a defendant, in his capacity as the Secretary of the Department of the Interior. Bruce Babbitt is now substituted as the current Secretary of the Department of the Interior.

Paula K. Smith and Linda Priebe, Salt Lake City, UT, for State of Utah and Bd. of trustees of Utah Navajo Trust Fund.

Stephen J. Sorenson, Salt Lake City, UT, and Thornton Field, Washington, DC, for U.S.

Marcelino R. Gomez, Bellaire, TX, for Navajo Nation.

Alan L. Sullivan, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, for Chuska Energy Co.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came before the court on plaintiffs' motion for summary judgment and defendants' cross motion for summary judgment. Plaintiffs moved in the alternative to supplement the record and for extended discovery. Plaintiffs, the State of Utah and the Board of Trustees of the Utah Navajo Trust Fund, were represented by Paula K. Smith and Linda Priebe. The United States defendants were represented by Stephen J. Sorenson and Thornton Field. Intervenor Navajo Nation was represented by Marceline R. Gomez. Intervenor CHUSKA Energy Co. was represented by Alan L. Sullivan. The parties filed extensive memoranda and supporting materials, after which the court heard oral argument and took the matter under advisement. Now being fully advised, the court renders its Memorandum Decision and Order.

### FACTUAL BACKGROUND

This matter is properly before this court as an administrative appeal of an Interior Board of Indian Appeals ("IBIA") decision pursuant to the Administrative Procedures Act. 5 U.S.C. § 551 et seq. (1988). This dispute centers on the interpretation of the Act of March 1, 1933 ("the 1933 Act"). 47 Stat. 1418, as amended, 82 Stat. 121 (1968).

The 1933 Act added lands from within the State of Utah to the Navajo Indian Reserva-tion. The newly added lands are referred to as the "Aneth Extension". The 1933 Act provided that such lands were for the benefit of the Indians who "settle thereon." Id. The 1933 Act further provides in pertinent part:

> Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, 37½ per centum of the *net royalties* accruing therefrom derived from *tribal leases* shall be paid to the State of Utah: *Provided*, That said 37½ per centum of said royalties shall be expended by the State of Utah *for the health, education, and general welfare of the Navajo Indians residing in San Juan County* . . . .

47 Stat. 1418, as amended, 82 Stat. 121 (emphasis added).

The Navajo Nation and Chuska Energy Company, ("Chuska"), entered into an oil and gas operating agreement on February 18, 1987, ("the Agreement"), under the authority of the Indian Mineral Development Act ("IMDA"). 25 U.S.C. §§ 2101–2108 (1988).[2] Under the Agreement, Chuska was authorized to conduct oil and gas operations on tribal lands, including land located in the Aneth Extension. Oil is currently being produced from the Aneth Extension under the Agreement. The State of Utah has not received any royalties from oil developed in the Aneth Extension pursuant to that Agreement.

By letter dated November 27, 1990, the State of Utah demanded from the Navajo Area Office, Bureau of Indian Affairs, ("BIA"), payment of 37½% of the oil royalties generated by the Agreement and derived from the Aneth Extension.[3] The BIA Area Director replied that the State of Utah is not entitled to receive 37½% of the owner's royalties by reason of the Agreement under the 1933 Act because the Agreement is not a lease and the 1933 Act applies only to "leas-

---

2. For the relevant text of the IMDA, see infra n. 13.

3. The November 27 letter was preceded by a letter dated November 6, 1990, requesting an accounting of royalties paid pursuant to the 1933 Act. The November 6 letter was followed by a meeting between representatives of the State of Utah and the Area Office. As a matter of clarification, the royalties paid to the State of Utah and referred to in the November 6 letter were not generated pursuant to the Agreement at issue in this case.

es".[4] The State of Utah appealed the Area Director's decision to the Interior Board of Indian Appeals ("IBIA") on February 19, 1991. The IBIA affirmed the Area Director, holding that the 1933 Act does not reach non-lease agreements entered into under the Indian Mineral Development Act, and that the Agreement in question is not a lease within the meaning of the 1933 Act. *State of Utah, Board of Indian Affairs and Division of Indian Affairs v. Navajo Area Director, Bureau of Indian Affairs,* 21 IBIA 282, 303, 309 (March 31, 1992). The State of Utah appealed the IBIA's decision to this court.

## SUMMARY JUDGMENT

■ Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. In considering summary judgment, the judge does not weigh the evidence and determine the truth of the matter, but rather determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The material facts in this case are not in dispute.

## ANALYSIS

I. *Whether the Court should defer to the agency's conclusion that the 1933 Act does not reach non-lease agreements.*

Congress has spoken directly and affirmatively to the issue of whether the term "lease" should be broadly interpreted. This court holds that for purposes of the 1933 Act, the term "lease" incorporates non-lease instruments. Consequently, this court does not defer to the agency's interpretation of

4. The BIA Area Director communicated his reply via two letters dated January 15 and January 17, 1991.

5. 5 U.S.C. § 706 provides in pertinent part: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the

the 1933 Act and gives effect to Congress' clearly expressed intent.

### A. Standard of review and applicable principles.

■ This court's review of the IBIA's administrative decision is guided by the Administrative Procedures Act, 5 U.S.C. § 706 (1988),[5] and the principles enunciated in *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* set forth a two-tiered test. "First, always, is the question whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781. If Congress' intent is clear, the reviewing court must not defer to the agency, but it must give effect to Congress' intent. *Id.* at 842–43, 104 S.Ct. at 2781–82; *see also Estate of Cowart v. Nicklos Drilling,* 505 U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); *Dole v. United Steelworkers,* 494 U.S. 26, 42–43, 110 S.Ct. 929, 938–39, 108 L.Ed.2d 23 (1990). On matters of statutory construction, the "judiciary is the final authority ... and must reject administrative constructions which are contrary to clear congressional intent." *N.L.R.B. v. Viola Industries–Elevator Div., Inc.,* 979 F.2d 1384, 1392 (10th Cir.1992) (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782). However, if the statute is silent or ambiguous with respect to the particular issue, the question for the court becomes whether the agency's interpretation of the statute is reasonable. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. An agency's construction of an ambiguous statute should be upheld if it is "plausible ... and does not otherwise conflict with Congress' expressed intent." *Rust v. Sullivan,* 500 U.S. 173, ——, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991).

meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....

B. Congress unambiguously expressed its intent.

1. Interpretation of the 1933 Act without reference to legislative history but considering the policy and purpose behind the statute.

a. General Principles.

■ On matters of statutory interpretation, a court begins by looking to the language of the statute itself. *Dole v. United Steelworkers,* 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990) (citations omitted). If the language is clear, that is the end of the matter. However, a court must read the language in the context of the "object and policy" of that law. *Id. See also Aulston v. United States,* 915 F.2d 584, 589 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991). Additionally, statutory language must be interpreted in light of the purpose behind the statute. *See Quinlivan v. Sullivan,* 916 F.2d 524, 526 (9th Cir.1990) (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) (citations omitted) ("Judicial deference is constrained, . . . by our 'obligation to honor the clear meaning of a statute, as revealed by its language, *purpose,* and history' ") (emphasis added)).

b. The statutory language reveals clear Congressional intent to benefit Navajo Indians residing in San Juan County.

■ The Act of 1933, as originally enacted, reads:

Should oil or gas be produced . . . within the lands hereby added to the Navajo Reservation, 37½ per centum of the *net royalties* . . . derived from *tribal leases* shall be paid to the State of Utah . . . said royalties shall be expended by . . . Utah . . . *for the benefit of the Indians residing therein.*

47 Stat. 1418 (emphasis added). In 1968, the statute was amended to provide that the royalties would be used "for the health, education, and general welfare of the Navajo Indians residing in San Juan County. . . ." 82 Stat. 121 (1968).

The language of the 1933 Act unequivocally declares Congress' intent that the *Navajos residing in San Juan County* benefit from oil and gas production on the Aneth Extension. Moreover, judicial interpretations of the 1933 Act conclusively establish that Congress intended to benefit those Navajos residing on the newly added lands. *See United States v. Jim,* 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972); *Sakezzie v. Utah Indian Affairs Commission,* 198 F.Supp. 218 (D.Utah 1961), *supplemented,* 215 F.Supp. 12 (D.Utah 1963).

■ In *United States v. Jim,* the Supreme Court recognized that the 1968 amendment "expanded the pool of beneficiaries" from those Indians in the Aneth Extension to all Navajos residing in San Juan County. 409 U.S. at 81, 93 S.Ct. at 262. The issue before that court was whether the reallocation of benefits effectuated by the 1968 amendment violated a property interest of the Aneth Extension Indians. *Id.* at 83, 93 S.Ct. at 263. Contrary to the IBIA's reading of *Jim,* the Supreme Court did not hold that the Navajo Tribe, as opposed to the Navajos residing in the Aneth Extension, were the beneficiaries of the 1933 Act.[6] In *Sakezzie v. Utah Indian Affairs Commission,* Judge Christensen of this court specifically held that the "tribe as a whole is not the designated beneficiary" of the 1933 Act. 198 F.Supp. at 225. It appears clear that the San Juan County Navajos are the intended beneficiaries of the 1933 Act.[7]

---

**6.** The Supreme Court held that the Aneth Extension Indians did not have a vested property interest in the oil and gas royalties generated pursuant to leases and that it was within Congress' power to alter the distribution scheme and reallocate the royalties. 409 U.S. at 83, 93 S.Ct. at 263.

**7.** The IBIA appropriately did not apply the canon that statutes should be construed and ambiguities should be resolved in favor of Indians. 21 IBIA at 293. *See South Carolina v. Catawba Indian Tribe,* 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986); *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* — U.S. —, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). The canon of construing ambiguities in favor of the Indians applies to controversies between Indians and non-Indians, not controversies between classifications of Indians. *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 1797 n. 7,

c. The statutory language is unclear as to whether benefits should be derived from non-lease agreements.

█ Congress intended to ensure that the San Juan County. Navajos would benefit economically from oil and gas produced from the Aneth Extension. The statute is silent with respect to the type of agreement which might be utilized to bestow the intended benefit, with the exception of a reference to "royalties derived from tribal *leases*." A narrow and strict interpretation of the term "lease", so as to exclude monies derived from oil and gas developed pursuant to other types of instruments, would contradict the clearly stated purpose of the statute. In all events, it is certainly not clear that Congress intended to *limit* such benefit to the production of oil and gas pursuant to traditional leases.[8] Accordingly, this court finds that from the face of the 1933 Act, the meaning of the term "lease" is unclear.

2. Interpretation of the 1933 Act with reference to legislative history.

a. Legislative history may clarify Congressional intent.

█ When a specific term in the statute is not clear, the inquiry under the first *Chevron* prong is not over. *Exxon Corp. v. Lujan*, 970 F.2d 757, 761 (10th Cir.1992). The court must look next to "secondary indicia of intent", such as the statute's legislative history, in order to determine whether Congress has addressed the issue. *Salt Lake City v. Western Area Power Administration*, No. 86–C–1000G, 1988 WL 167244, at *10 (D.Utah April 14, 1988), *aff'd*, 926 F.2d 974 (10th Cir.1991) (citing *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434, 448 n. 12 (1987)). If the legislative history clearly reveals Congress' intent, this court is bound to give effect to that intent. *Exxon Corp.*, 970 F.2d at 761. *See also Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 (if a court, "employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect").

b. Legislative history in this case clarifies Congressional intent.

█ The legislative history of the 1933 Act reveals that "provision is made for disposition of *any revenue* arising from any oil and gas which might be discovered within the area." H.R.Rep.No. 1883, 72nd Cong., 2d Sess. 2 (1933); S.Rep. No. 1199, 72nd Cong., 2d Sess. 2 (1933) (emphasis added). This court reads the legislative history as demonstrating that Congress intended to ensure that the San Juan County Navajos benefit from oil and gas development on the Aneth Extension, without regard to the type of agreement by which the resources are developed.

The IBIA held that the legislative history does not clarify the issue and that the legislative history itself is ambiguous. 21 IBIA at 291. "It simply declares that provision is made for disposition of 'any revenue,' not that [the San Juan Navajos] were to receive a portion of 'any revenue.'" *Id.* The IBIA concluded that provision is made for disposition of any revenue, but somehow found that the revenue was not to be disposed of pursuant to the 1933 Act.[9] This court disagrees.

The language of the 1933 Act identifies the Navajos residing in San Juan County as the beneficiaries of the Act. Congress specifically provided that those Indians should receive royalties from oil and gas "leases" on the Aneth Extension. The IBIA correctly deter-

48 L.Ed.2d 274 (1976) (canon had no application where "contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members"). The instant situation is a controversy between an Indian tribe and a specified class of that Indian tribe—specifically the Navajo Nation and the Navajos residing in San Juan County.

8. *See infra* n. 14 and relevant text for discussion of traditional leases.

9. To so hold would render the statute internally inconsistent. If, as the IBIA concluded, the statute is read so that the disposition to the San Juan County Navajos of "any revenues" is limited to royalties derived from traditional leases, then there would be no provision for the disposition of revenues generated pursuant to any other type of agreement. Under this reading of the law, the IBIA could not properly conclude that Congress provided for the disposition of "any revenues."

mined that Congress provided for the disposition of "any revenue". It necessarily follows that such revenue must be disposed of pursuant to the 1933 Act. Congress expressed no intention to limit the disposition of revenues generated pursuant to *traditional* leases. On the other hand, Congressional intent is clear that the San Juan Navajos are to receive oil and gas revenues "arising from any oil and gas ... discovered in the area" regardless of the mechanism used to develop the resources.

II. *Whether the Agreement in question constitutes a "lease" within the meaning of the 1933 Act.*

A. The Operating Agreement is encompassed within the broad meaning of the 1933 Act.

■ The 1933 Act, as amended, reflects a considered congressional policy choice to benefit the Navajo residents of San Juan County. A broad reading of the term "lease" achieves Congress' goal of economically assisting the San Juan County Navajos and ensuring that they receive 37½% of the revenues derived from oil and gas discovered in the Aneth Extension. The Operating Agreement at issue was the instrument through which oil was discovered and revenues were generated within the Aneth Extension. In order to give effect to Congress' clearly expressed intent, this court holds that the 1933 Act reaches that Agreement.[10] Thus, pursuant to the 1933 Act, the San Juan County Navajos are entitled to receive, through their

fiduciary the State of Utah,[11] 37½% of the royalties derived from the Chuska Operating Agreement.

B. Congressional and Department of Interior definitions of "lease" embrace non-lease agreements.

■ The term "lease" is not defined in the 1933 Act or in the 1968 amendment. Also, there are no regulations promulgated pursuant to the 1933 Act. However, this court's broad reading of the term "lease" under the 1933 Act is confirmed by the long-standing definitions attributed to the term by Congress and the Department of Interior. Both consistently have defined "lease" to include non-lease agreements in the context of oil and gas law. It follows that for purposes of the 1933 Act, "lease" must mean what Congress and the Department of Interior have understood it to mean in the context of oil and gas management on federal and Indian lands. A representative overview of statutory and regulatory use of the term "lease" is in order.

■ Indian tribal resource development historically has been governed by a smorgasbord of federal statutes.[12] In 1938, Congress passed the first comprehensive statute pertaining to the authorization and regulation of tribal leases with the Indian Mineral Leasing Act, 25 U.S.C. §§ 396a–396g (1988). In 1982, Congress enacted the Indian Mineral Development Act, ("IMDA"), 25 U.S.C. § 2101 *et seq.* (1988), which afforded tribes more flexibility in developing their natural resources.[13]

10. The Operating Agreement at issue in this case is reviewed under the broad definition of the term "lease" as adopted by this court. This court has concluded that the IBIA erred as a matter of law in its interpretation of the 1933 Act as referring only to "traditional" leases, so there is no need to determine whether the Operating Agreement constitutes such a "traditional" lease under the more restrictive definition utilized by the IBIA.

11. The Act of 1933 and the *Sakezzie* decisions conclusively determine that the State of Utah is a fiduciary for the beneficiaries of the 1933 Act, the San Juan County Navajos.

12. For instance, the Act of February 28, 1891, authorized the leasing of Indian lands that were not needed for agricultural purposes, 25 U.S.C.

§ 397; the Act of March 3, 1909 provided for the leasing of allotted lands for mining purposes, 25 U.S.C. § 396; and The Act of May 29, 1924 amended the 1891 Act, providing for the leasing of unallotted lands for oil and gas mining purposes. 25 U.S.C. § 398.

13. The IMDA provides in pertinent part:

Any Indian tribe, subject to the approval of the Secretary and any limitation or provision contained in its constitution or charter, may enter into any joint venture, operating, production sharing, service, managerial, lease or other agreement ... providing for the exploration for, or extraction, processing, or other development of, oil, gas, uranium, coal, geothermal, or other ... mineral resources....

25 U.S.C. §§ 2102(a).

The IMDA specifically authorized tribes to enter into non-lease agreements, such as operating agreements or joint ventures. Until the passage of the IMDA, traditional leases [14] were the primary tool for developing Indian natural resources.[15] However, non-lease arrangements have been authorized since 1871. *See* 25 U.S.C. § 81 (1988).

█ Congress also enacted the Federal Oil & Gas Royalty Management Act of 1982, ("FOGRMA"), 30 U.S.C. § 1701 *et seq.* (1988), to govern the management and disposition of oil and gas royalties on federal and Indian lands. In FOGRMA, "lease" is broadly defined as "any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, extraction of, or removal of oil or gas." 30 U.S.C. § 1702(5). Mineral leasing law means "any Federal law administered by the Secretary authorizing the disposition under lease of oil or gas." 30 U.S.C. § 1702(8). The IMDA and the 1938 Mineral Leasing Law are "leasing laws" under FOGRMA. Accordingly, the definition of lease for purposes of the IMDA and the 1938 Mineral Leasing Law must be the definition set forth in FOGRMA.[16]

█ Congress has defined "lease" to incorporate more than traditional leases. That broad congressional definition should be applied to the 1933 Act. A statutory term should be construed so that it "fits most logically and comfortably into the body of both previously and subsequently enacted law." *West Virginia University Hospitals v. Casey,* 499 U.S. 83, 100, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991) (citations omitted).[17]

The Department of the Interior likewise broadly defines the term "lease". In this regard, federal regulations applicable to royalty management on Indian lands [18] define *"lease"* as: "any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law...." 30 C.F.R. §§ 206.101, .151 (1992). *See also* 30 C.F.R. § 216.6(k) (production and accounting); §§ 218.56 & .105 (collection of royalties, rentals, bonuses); § 219.105 (distribution and disbursement of royalties, rent and bonuses); 43 C.F.R. § 3160.0–5 (onshore oil and gas—restricted Indian land leases). These federal regulations were promulgated, in part, pursuant to the Federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1701 *et seq.* (1982), the Indian Mineral Development Act of 1982, 25 U.S.C. § 2101 *et seq.* (1982), the Indian Mineral Leasing Act of 1938, as amended, 25 U.S.C. §§ 396a–396g (1938), the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* (1920), and the Leases of Allotted Lands for Mining Purposes, the Act of March 3, 1909, 25 U.S.C. § 396 *et seq.* (1909). The regulatory definition of "lease" is identical to FOGRMA's statutory definition and it encompasses non-lease agreements.

This court concludes that for purposes of the 1933 Act, "lease" properly embraces non-

---

14. A traditional oil and gas lease is an actual conveyance of a real property interest, and the lessee typically obtains the exclusive right to develop the resource. *See Slaaten v. Cliff's Drilling Co.,* 748 F.2d 1275, 1277 (8th Cir.1984). Intervenors and the IBIA maintain that the term "lease" in the 1933 Act means only the traditional lease, in part because the Indian Non-intercourse Act of 1834, 25 U.S.C. § 177, refers to "lease or other conveyance of lands". *See* 21 IBIA at 305. This court is persuaded that statutory and regulatory use of the term "lease" over the years justifies a much broader interpretation, one which embraces non-lease agreements.

15. *See* 21 IBIA at 292; H.R.Rep. No. 746, 97th Cong., 2d. Sess. 3 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3465, 3465–466.

16. It is noteworthy that in 1991, the BIA proposed a regulation under the 1938 Mineral Leasing Act defining "lease" as "any contract, profit sharing arrangement, joint venture, or other agreement ... that authorizes exploration for, extraction of, or removal of any minerals." 56 Fed.Reg. 58734, 58738 (1991). This proposed regulation to date has not been officially adopted. However, in August of 1992, the comment period on it was reopened.

17. Although the *Casey* decision involved an ambiguous statutory term, the proposition enunciated applies to statutory interpretation in general.

18. Title 30, Part 206, subparts C and D of the federal regulations apply to "all [oil & gas] production from Federal and Indian ... oil and gas leases." 30 C.F.R. §§ 206.100, 206.150 (1992).

lease agreements. Such a reading of the statute renders the term "lease" in the 1933 Act consistent with Congress' own definition of the term.[19]

### C. Agency's reasoning underlying its narrow interpretation of the term "lease" is erroneous.

#### 1. Broad interpretation is not inconsistent with the IMDA.

 It is a basic canon of statutory construction that statutes should be read in harmony, and not in conflict. *See In re Harline,* 950 F.2d 669, 675 (10th Cir.1991) *cert. denied, Gladwell v. Harline,* —— U.S. ——, 112 S.Ct. 2991, 120 L.Ed.2d 869 (1992). This court finds that a broad reading of "lease" in the 1933 Act can be harmonized with the IMDA.

The federal defendants and Intervenors argue that a broad reading of "lease" in the 1933 Act would render the 1933 Act inconsistent with the IMDA, which reads: "Any Indian tribe·... may enter into any joint venture, operating, production sharing, service managerial, lease *or other agreement....*" 25 U.S.C. § 2102 (emphasis added). The

IBIA concluded that defining "lease" broadly for purposes of the Act of 1933 would be inconsistent with Congress' use of the language "lease or other agreement" in the IMDA. Thus, the IBIA reasoned, Congress could not have intended that "lease" in the 1933 Act should incorporate other forms of agreements.[20] This court disagrees with the IBIA'S conclusion.[21]

The 1933 Act and the IMDA can be read in harmony if one looks to FOGRMA's definition of "lease" and the regulatory definition promulgated ·pursuant to the IMDA and FOGRMA. As discussed above,[22] the regulations promulgated pursuant to the IMDA consistently define "lease" to encompass non-lease agreements. Moreover, FOGRMA's broad definition of "lease"[23] applies to any agreement issued under a mineral leasing law. The IMDA is a mineral leasing law. Thus, "lease", under the IMDA, encompasses non-lease agreements.[24]

Based upon the foregoing, it cannot be said that interpreting "lease" for purposes of the 1933 Act to reach non-lease agreements would render the 1933 Act inconsistent with

**19.** The defendants contend that because there is more than one federal definition of "lease", it should not be defined to include non-lease instruments for purposes of the 1933 Act even though Congress, in FOGRMA, specifically defined "lease" to include other types of agreements. However, defendants have failed to point to a single example of a more restrictive federal definition of lease.

**20.** 21 IBIA at 302. The IBIA stated: "Clearly, in [the] IMDA, where the. term "lease" is included in a list of several forms of agreement, Congress did not intend that "lease" would incorporate all the other forms."

**21.** The federal defendants argue that the IMDA was passed because the only method by which tribes could develop their resources was through traditional leases. Their position is that a broad interpretation of "lease" in the 1933 Act would . contradict the definition of "lease" in the IMDA. Defendants' reasoning is flawed. The legislative history of the IMDA is clear that Congress was aware that tribes could enter arrangements other than leases, but that the IMDA was necessary to alleviate the need to differentiate between the types of arrangements. *See* H.R.Rep. No. 746, 97th Cong., 2d. Sess. 3 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3466. This does not indicate to this court that a broad interpretation of "lease"

for purposes of the 1933 Act would contradict "lease" as used in the IMDA.

**22.** *See supra* section II. B.

**23.** "Lease" means "any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, extraction of, or removal of oil or gas." 30 U.S.C. § 1702(5). .

**24.** The 1933 Act and the IMDA can also be harmonized if each statute is categorized based on its overall purpose. The IMDA is an authorization statute. That is, it authorizes development of oil and gas resources on Indian lands. The 1933 Act and FOGRMA are revenue management—disbursement statutes. That is, they dictate the particulars of how to disburse and manage revenues derived from the development of oil and gas reserves. Terms found in the 1933 Act should be construed consistently with terms .in similar statutes with the same purpose, such as FOGRMA, rather that different statutes with different purposes, such as the IMDA. FOGRMA expressly defines "lease" to include other types of agreements. It follows that the term "lease" in the 1933 Act should also include other types of agreements, regardless of the meaning attributed to "lease" in the IMDA.

the IMDA. To the contrary, a broad reading of the language in the 1933 Act is consistent with the IMDA.

2. Broad interpretation does not interfere with Tribal Sovereignty.

 The 1933 Act manifests dual objectives: protecting the economic interests of those Indians living in the annexed lands as well as increasing the jurisdictional base of the Navajo Nation. 21 IBIA at 297. A well established principle of Indian law is that statutory words should not be expanded beyond their clear meaning where to do so would result in an intrusion upon tribal sovereignty. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). The IBIA, relying on the *Santa Clara* principle, determined that a broad reading of the term "lease" would intrude upon the Navajo Nation's tribal sovereignty. 21 IBIA at 298–99.

To begin with, even if a broad interpretation would intrude upon or modify tribal sovereignty, Congress has plenary authority to do so. *Santa Clara Pueblo,* 436 U.S. at 56, 98 S.Ct. at 1675–76. Congress' authority over Indian matters is extra-ordinarily broad, and the judiciary's role correspondingly must be exercised within the scope of what the Congress determines. *Id.* at 72, 98 S.Ct. at 1684. Since Congress chose to provide to the resident Indians 37½ per cent of the royalties derived from oil and gas revenues on the annexed lands, neither the IBIA nor this court is at liberty to modify that which Congress has given to the San Juan County Navajos.

In any event, this court is not bound by an agency's attempted reconciliation of conflicting policies within a statute when the agency's interpretation "appears from the statute or its legislative history" to be a reconciliation that "Congress would [not] have sanctioned." *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 382–83, 81 S.Ct. 1554, 1560–61, 6 L.Ed.2d 908 (1961)). In the case at bar, the IBIA's attempted reconciliation of the Act's conflicting policies is contrary to

Congress' express intent and recognized purpose of protecting the economic interests of the San Juan County Navajos.

Based upon the foregoing, it is hereby

ORDERED, that plaintiffs' Motion for Summary Judgment is granted;[25] it is

FURTHER ORDERED, that defendants' Motion for Summary Judgment is denied.

Counsel for plaintiffs is directed to prepare and lodge with the court a form of Judgment consistent with this Memorandum Decision and Order, after first complying with local Rule 206(b).

IT IS SO ORDERED.

---

**25.** Since summary judgment is granted, there is no need to address plaintiffs' alternative motion to supplement the record and for extended discovery.