53 F.3d 1145
 STATE OF UTAH, Board of Trustees of the Utah Navajo Trust
Fund, Plaintiffs-Appellees,
v.
Bruce BABBITT, in his capacity as Secretary of the United
States Department of the Interior; Department of the
Interior; Bureau of Indian Affairs; Navajo Area Director,
Bureau of Indian Affairs; United States of America,
Defendants-Appellants,
Navajo Nation, Intervenor-Appellant,
and
Chuska Energy Co., Intervenor.
 Nos. 94-4062, 94-4063.
 United States Court of Appeals,
Tenth Circuit.
 April 26, 1995.
 
 Philip C. Pugsley, Asst. Atty. Gen. (Brian Farr and Reed Richards with him on the brief), Salt Lake City, UT, for plaintiffs-appellees.
 David C. Shilton, Atty., Dept. of Justice (Lois J. Schiffer, Acting Asst. Atty. Gen., Washington, DC, Thornton W. Field and Edward J. Shawaker, Attys., Dept. of Justice, Washington, DC, and Edwin G. Winstead, Field Sol., U.S. Dept. of the Interior, Window Rock, AZ, with him on the brief), Washington, DC, for defendants-appellants.
 Kevin N. Anderson (Joe Lennihan, Navajo Nation Dept. of Justice, Window Rock, AZ, Diane H. Banks and Douglas R. Brewer of Fabian & Clendenin, Salt Lake City, UT, with him on the brief), Las Vegas, NV, for intervenor Navajo Nation.
 Before KELLY, BARRETT and HENRY, Circuit Judges.
 PAUL J. KELLY, Jr., Circuit Judge.
 
 
 1
 Defendants-appellants appeal from the district court's judgment in favor of Plaintiffs-appellees. Our jurisdiction arises under 28 U.S.C. Sec. 1291 and we affirm.
 
 Background
 
 2
 Under the Act of March 1, 1933 ("Act"), 47 Stat. 1418, as amended, 82 Stat. 121 (1968), the federal government took 552,000 acres of land from the public domain and added it to the Navajo Reservation. The Act provided that if "oil or gas [were] produced in paying quantities within the lands ... added to the Navajo Reservation, 37 1/2 per centum of the net royalties accruing therefrom derived from tribal leases [would] be paid to the State of Utah." 47 Stat. 1418, as amended, 82 Stat.121 (1968); Aplee.Supp.App. at 30. The royalties collected by Utah were to be used to provide benefits to the Navajos who resided on the added lands. Oil was subsequently discovered on one of the added tracts of land, known as the Aneth Extension. Royalties derived from leases on the land were divided according to the Act, with 37 percent going to Utah and 62 1/2 percent going to the Navajo Nation.
 
 
 3
 In 1968, Congress amended the Act to allow more flexibility in distributing funds to the Navajos. Specifically, the amendment provided that the State of Utah was to spend the royalties collected "for the health, education, and general welfare of the Navajo Indians residing in San Juan County." Act of May 17, 1968, 82 Stat. 121; Aplee.Supp.App. at 32. Congress effected this change after determining that many Navajo Indians did not reside permanently on the added lands, but moved back and forth between this area and other locations.
 
 
 4
 In 1987, the Navajo Nation and Chuska Energy Co. ("Chuska") entered into what was referred to as an "operating agreement." The agreement appointed Chuska as the exclusive oil and gas operator of certain land and as the sales agent for the oil and gas produced from the land. The agreement was approved by the Area Director of the Bureau of Indian Affairs ("BIA"). Under the terms of the agreement, Chuska paid the Navajo Nation both a set sum for each acre of land it utilized and a percentage of the gross proceeds, initially 20 percent, received from the sale of production on the land.
 
 
 5
 Previously unleased portions of the Aneth Extension constitute part of the land being developed by Chuska under the agreement. Consequently, in November 1990, Utah demanded payment of 37 1/2 percent of the royalties from the production of oil and gas on that particular land. The Area Director, however, found that such payment was not required because the Act only applied to leases, as opposed to an operating agreement. Utah appealed the BIA Area Director's decision to the Interior Board of Indian Appeals ("IBIA"), which affirmed the BIA's decision. Utah then challenged the IBIA's holding in federal district court, and the Navajo Nation and Chuska intervened as defendants. The district court subsequently granted summary judgment in favor of Utah.
 
 
 6
 The federal Defendants now appeal, arguing that the district court erred both in finding that the royalty-sharing provision of the Act applied to the agreement and holding the Secretary of the Interior ("Secretary") responsible for the collection and payment of royalties owed to the State of Utah. The Navajo Nation also appeals, arguing that the district court erred in reversing the IBIA's decision, and holding that the Act refers to any revenue flowing from tribal leases, and ordering an accounting from Defendants.
 
 I. The 1933 Act
 
 7
 We review a grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). James v. Sears, Roebuck & Co., 21 F.3d 989, 997-98 (10th Cir.1994). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " Hagelin for President Comm. v. Graves, 25 F.3d 956, 959 (10th Cir.1994) (quoting Fed.R.Civ.P. 56(c)), cert. denied, --- U.S. ----, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). We consider the "factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Blue Circle Cement, Inc. v. Bd. of County Comm'rs., 27 F.3d 1499, 1503 (10th Cir.1994).
 
 
 8
 We also review de novo the district court's interpretation of a federal statute. FDIC v. Lowery, 12 F.3d 995, 996 (10th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2674, 129 L.Ed.2d 809 (1994). When reviewing an agency's interpretation of a statute it administers, we first determine whether the statute is unambiguous. In re BDT Farms, Inc., 21 F.3d 1019, 1021 (10th Cir.1994) (citing Chevron U.S.A. Inc v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). If the intent of Congress is clear then we must give effect to that intent. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." NLRB v. Viola Industries-Elevator Div., Inc., 979 F.2d 1384, 1392 (10th Cir.1992) (quoting Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). If, however, the statute is ambiguous or silent on the issue in question, we must determine whether the agency's determination is based on a permissible construction of the statute. United States v. Undetermined Quantities of Bottles of An Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir.1994) (citing Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781). If so, we will defer to the agency's interpretation. Chevron, 467 U.S. at 844, 104 S.Ct. at 2782.
 
 
 9
 In determining the meaning of a statute, we look at not only the statute itself but also at the larger statutory context. BDT Farms, 21 F.3d at 1021 (citing Rake v. Wade, --- U.S. ----, ----, 113 S.Ct. 2187, 2193, 124 L.Ed.2d 424 (1993)). We may ascertain the intent of Congress through statutory language and legislative history. See Train v. Colorado Pub. Int. Research Group, Inc., 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (" 'When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination.' " (quoting United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)) (internal quotations omitted)). See also Chevron, 467 U.S. at 859-64, 104 S.Ct. at 2790-92; Miller v. Commissioner of Internal Revenue, 836 F.2d 1274, 1282 (10th Cir.1988).
 
 
 10
 The language in the Act provides that royalties from oil or gas production on the added lands "derived from tribal leases" will be paid to Utah "for the benefit of the Indians residing therein." 47 Stat. 1418, as amended, 82 Stat. 121 (1968); Aplee.App. at 30-31. "Tribal leases" are not specifically defined, but nothing in the statute suggests that the term only finds application if the instrument is captioned "tribal lease" or "lease," without regard to the instrument's true function.
 
 
 11
 The Act's legislative history makes clear that Congress intended the Navajos residing on the added lands to benefit from leasehold development on that particular land. The House Report accompanying the legislation states that "[p]rovision is made for disposition of any revenue arising from any oil and gas which might be discovered within the area." H.R.Rep. No. 1883, 72d Cong., 2d Sess. 2 (1933). Because we find Congress' intent clear, we are unable to subscribe to the agency's narrow, technical view.
 
 
 12
 We further believe that the particular agreement at issue falls squarely within the meaning of the term "lease" as used in the Act. "[S]tatutory terms are often clarified by the remainder of the statutory scheme--because the same terminology is used elsewhere in a context that makes [the term's] meaning clear...." Rake, --- U.S. at ----, 113 S.Ct. at 2193 (internal quotations omitted). We construe a statutory term so that it "fits most logically and comfortably into the body of both previously and subsequently enacted law." West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 100-01, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991) ("[O]ur role [is] to make sense rather than nonsense out of the corpus juris.") (citations omitted).
 
 
 13
 The Act does not define the term "lease," and no regulations were promulgated pursuant to the statute. Congress and the Department of the Interior, however, have consistently defined "lease" in functional terms.
 
 
 14
 In 1936, a regulation governing the development and production of oil and gas on Indian lands defined a "lease" as "[a] prospecting permit, lease, or other agreement authorized by law for the development and production of oil or gas." Oil and Gas Operating Regulations, 1 Fed.Reg. 2296, 2297 (1936); Aplee.App. at 92. This regulation was revised in 1942 to define a "lease" as "[a]n agreement which ... grants to a lessee the exclusive right and privilege of developing and producing oil or gas deposits owned by the lessor." Oil and Gas Operating Regulations, 6 Fed.Reg. 4132, 4133 (1942); Aplee.App. at 94.
 
 
 15
 In the Federal Oil & Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C.A. Sec. 1701-57, Congress defined "lease" as "any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, extraction of, or removal of oil or gas." 30 U.S.C.A. Sec. 1702(5) (West 1986). FOGRMA was enacted "to clarify, reaffirm, expand, and define the responsibilities and obligations of lessees, operators, and other persons involved in transportation or sale of oil and gas from the Federal and Indian lands." Id. Sec. 1701(b)(1).
 
 
 16
 Moreover, in regulations promulgated pursuant to royalty management of mineral resources, the Department of the Interior defined lease as "any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, development or extraction of, or removal of lease products." 30 C.F.R. Sec. 206.101 (1994). This regulation applies to "all oil production from Federal and Indian ... oil and gas leases." Id. Sec. 206.100.
 
 
 17
 The Defendants' argument that a broad definition of the term "lease" would be inconsistent with the Indian Mineral Development Act of 1982 ("IMDA"), 25 U.S.C.A. Sec. 2101-08, is without merit. The IMDA provides that a tribe may enter into "any joint venture, operating, production sharing, service, managerial, lease or other agreement" for the development of oil and gas. 25 U.S.C.A. Sec. 2102(a) (West 1986). Defendants argue that because both "lease" and "operating agreement" are listed, it is not proper to consider an operating agreement as sometimes falling within the definition of a lease. Such an argument is one of form over substance.
 
 
 18
 The agreement at issue bears many of the most significant characteristics of a typical lease. The agreement creates a working interest in the minerals, contains a primary term as well as a lengthy secondary term in the event of production, requires Chuska to pay a bonus, royalties, and delay rentals to the Navajo Nation, grants the Navajo Nation the right to take production in kind, and requires Chuska to take all the risk as to capital and operating costs. See Aplee.Supp.App. at 59-100. Although this document is not captioned "lease" or "tribal lease," it establishes a relationship similar to that created between a lessor and lessee under a typical oil and gas lease. See 8 Williams & Meyers, Oil & Gas Law 1225 (1994). As a result, we conclude that this agreement by its specific terms is in the nature of a lease. Indeed, it would contravene Congress' intent to provide aid to the Navajos residing on the added lands if we precluded royalties from reaching them simply because such royalties were derived from an instrument basically similar to a tribal lease but bearing a different title.
 
 
 19
 Defendants argue, however, that we should not apply the royalty-sharing provision to the operating agreement because of the canon that statutes should be construed and resolved in favor of Native Americans. See South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986). We find this canon inapplicable here because the interests at stake both involve Native Americans. See Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 1797 n. 7, 48 L.Ed.2d 274 (1976) ("[This] canon has no application here; the contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members.") On the one hand Utah seeks royalties which will be used for the benefit of Navajos residing in San Juan County, while on the other hand the Navajo Nation seeks to retain all of the royalties.
 
 
 20
 The Defendants further argue that our holding interferes with tribal sovereignty. Congress has plenary authority to "limit, modify or eliminate" tribal sovereignty; and where Congress has expressed intent to create such an intrusion, we must give effect to that intent. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978). Accordingly, we must further Congress' intent to benefit specific Navajos through the oil and gas royalty-sharing provision.
 
 
 21
 Furthermore, we are not persuaded by Defendants' argument that because the royalty-sharing provision is so similar to state taxation, we may not find that Congress has authorized the provision unless Congress has " 'made its intention to do so unmistakably clear.' " County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 258, 112 S.Ct. 683, 688, 116 L.Ed.2d 687 (1992) (quoting Montana v. Blackfeet Tribe, 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985)). Regardless of whether the royalty-sharing provision functions as a tax, we believe congressional intent to authorize and implement the provision is clear.
 
 
 22
 Moreover, the district court did not hold that the royalty-sharing provision applies to any revenue derived from tribal leases, as Defendants have claimed. Rather, the district court held that under the Act, the San Juan County Navajos are entitled to receive "37 1/2% of the royalties derived from the Chuska Operating Agreement" attributable to production from the extension area. State of Utah v. Babbitt, 830 F.Supp. 586, 593 (D.Utah 1993). The judgment states that "plaintiffs are entitled to 37 1/2% of all oil and gas royalties or revenues paid to the Navajo Nation from any oil and gas production under the 1987 Agreement on lands added to the Navajo Reservation by the 1933 Act." Aplt.App. at 126 (emphasis added). These holdings entitle Plaintiffs to a percentage of the royalties and revenues resulting from oil and gas production under the agreement attributable to the extension lands, not "any revenue flowing from tribal leases" as Defendants have claimed. Aplt.Br. (Navajo Nation) at 1.
 
 
 23
 II. Responsibility for Collecting and Paying Royalties to Utah
 
 
 24
 The federal Defendants claim that the district court erred in ordering the Secretary of the Interior to collect and pay to Utah royalties due under the Act. We review questions of law de novo. Estate of Holl v. Commissioner, 967 F.2d 1437, 1438 (10th Cir.1992).
 
 
 25
 The federal Defendants argue that the Secretary is not obligated to carry out this administration of royalties. The Act is silent as to who holds the responsibility of royalty collection. FOGRMA provides, however, that "[t]he Secretary shall establish a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties ... and to collect and account for such amounts in a timely manner." 30 U.S.C. Sec. 1711(a) (West 1986). Moreover, Congress has found that the Secretary "should aggressively carry out his trust responsibility in the administration of Indian oil and gas." Id. Sec. 1701(a)(4).
 
 
 26
 Defendants argue that requiring the Secretary to collect and pay over the royalties is contrary to the express terms and purpose of the IMDA. We disagree. Just because a regulation promulgated pursuant to the IMDA allows parties to designate a party other than the Secretary to collect royalties does not mean that the Secretary may never handle such administration. See 25 C.F.R. Sec. 225.31 (1994).
 
 
 27
 We find no evidence that the parties to the agreement designated another party to collect and settle royalties owed to Utah. Moreover, the agreement provides that the "Operator agrees to be supervised and monitored by ... any ... agency of the Department of Interior as set forth in Title 30 and Title 25 of the Code of Federal Regulations and any other applicable law or regulation." Aplt.App. at 98. Consequently, it was not error for the district court to order the Secretary to perform the administration of royalties. We are not suggesting that the Secretary pay the sum due out of governmental monetary sources, but that he oversee the collection of the proper amount from the Navajo Nation and the payment thereof to Utah.
 
 
 28
 AFFIRMED.