151 F.3d 1251
 98 CJ C.A.R. 3952
 SOUTHERN UTE INDIAN TRIBE, Plaintiff-Appellant,
v.
AMOCO PRODUCTION COMPANY; Shirley K. Adams; Henry
Ashworth; Carla M. Aspaas; Eric K. Aspaas; Helen Ruth
Aspaas; Laurabelle Aspaas; Leta M. Adkins; Rita M.
Adkins; Maxwell C. Anderson; Earl A. Barker; Maurice C.
Breen, named as: Heirs of Maurice C. Breen, deceased;
Horace F. Buchanan, named as: the Heirs of Horace Buchanan,
deceased; George A. Bugg; Carbone Investment Company;
Jack Carmack; Rowland Carmack; Joseph C. Ciancio; William
Kemp Clark; Colorado National Bank, George Veto Trust;
Colorado National Bank of Longmont, conservator Gladys N.
Frazzini; Dorothy A. Corgin; Kelly Cox, named as: the
Heirs of Kelly Cox, deceased; A.B. Crosby; Barbara Crosby;
David Crosby; John Crow, Jr.; Margaret Crow; Manuel
Cruz; Louis M. Cummins; Frederick E. Dickerson; J.M.
Eakes; Robert McFerran Eakes; Margaret Ellison; Sally M.
Etterbeck; Minnie Flaks; Tillie Flaks; Cassio Frazzini;
Adele Frost; Robert Galbasin; Abel S. Gallegos; Montey
Garnand; Ruby Gibbs Goggans; Christine Hamilton; Hardin
Simmons University; H.A. Harmon, named as: the Heirs of
H.A. Harmon, deceased; Hondo Oil & Gas Company, named as:
the shareholders of Hondo Oil & Gas Company (dissolved);
Hyde Oil and Gas Corporation; Charles Kettering; Fidel
Lucero; Richard C. Malcomb; Suzanne Heath Manges;
Catherine B. McElvain; Mabel McElvain; Thornton H.
McElvain,Jr.; Dorothy N. McKelvey; Edwin L. McKelvey; R.
Franklin McKelvey; W.R. McMahon; McMurry Oil Company; W.
Clay Meredith Charitable Trust; W.A. Moncrief, named as:
the Heirs of W.A. Moncrief, deceased; Roy E. Montgomery,
personal representative for the Estate of W. Clay Meredith,
deceased; Forrest D. Miller, named as: the Heirs of
Forrest D. Miller, deceased; HELEN L. MILLER, named as:
the Heirs of Helen L. Miller, deceased; Thomas S.
Morrissey; Thomas J. Morrissey; Emil Mosbacher; Emil
Mosbacher, III; John David Mosbacher; R. Bruce Mosbacher;
Myra Theresa Moulds; North Central Oil Corporation; H.L.
Oliver; Clara Onofrio; Margaret C. Pargin; Harold F.
Payne, Jr.; Neville G. Penrose; Ben M. Peterson, Jr.;
Frederick Petrocco; Phillips Petroleum Company; James M.
Raymond; W.E. Rennie, named as: the Heirs of W.E. Rennie,
deceased; Thomas C. Romolo; Benton E. Smullyen; Clinton
I. Smullyen; William Stirling; J.L. Tatum, named as: the
Heirs of J.L. Tatum, deceased; Anna Carleo Tomeo; Ernest
Tomeo; Turner Securities; Richard W. Turner, Sr.; George
C. Vance, named as: the Heirs of George C. Vance, Deceased;
Anthony H. Veto; Joseph F. Ware, Jr.; Albert E. Zarlengo;
Anthony F. Zarlengo, John Doe and all other unknown persons
claiming an interest in the mineral estate located within
the N/2 of section 12, T33N, R8W, N.M.P.M., La Plata County,
Colorado; Amax Oil & Gas, Inc.; Bowen/Edwards Associates,
Inc.; Fuel Resources Development Company; McKenzie Methane
Corporation; Meridian Oil, Inc.; Mobil Oil Corporation;
National Cooperative Refinery Association; Northwest
Pipeline Corporation; Pablo Operating Company; Palo/Eagle
Joint Ventures; Richmond Petroleum, Inc.; Williams
Production Company; Manuel Lujan, Jr., Secretary of the
United States Department of the Interior; Department of
Interior, and its subordinate agencies; Bureau of Indian
Affairs; Bureau of Land Management; Minerals Management
Service; Eddie F. Brown, Assistant Secretary of the Bureau
of Indian Affairs; Catherine Frances McElvain Harvey;
Delos Cy Jamison, Director of the Bureau of Land Management;
and Scott S. Sewell, Director of the Minerals Management
Service; Class of Defendants situated similarly to those
named non-governmental defendants who claim ownership of an
interest in coalbed methane and other coal constituents or
claim the right to explore for, develop or produce those
substances from coal or coal strata reserved by the United
States in patents issued under the Act of March 3, 1909, or
the Act of June 22, 1910, for lands located within the
exterior boundaries of the Southern Ute Indian Reservation
and which class members have not obtained tribal consent to
and federal approval of said interests of rights; Jack
Balle; J.M. Huber Corporation, Oil & Gas Division; Mary
Jean Balle; Donald C. Ciancio; Susie M. Ciancio; NCNB
Texas National Bank, as Trustee of the Kelly Cox
Testamentary Trust; Addie G. Crosby; Jack W. Crosland,
Jr.; Henry L. Enochson; Mary Jane Enochson; J.L. Goggans;
Liberty Tulsa, as trustee of the Christine J. Hamilton
Trust; Helen Crosland Hendricks; Thomas L. Johnstone;
James Eric Kaindl; Larry James Kaindl; Lisa Jean Kaindl;
Jane P. Mosbacher, named as The Heirs of Jane P. Mosbacher,
Deceased; PM Associates, a Colorado general partnership;
First Interstate Bank of Denver, as Co-trustee of the Estate
of W.E. Rennie est W.E. Rennie; Roderick L. Turner; Wells
Fargo Bank, as trustee of the George C. Vance Trust; Albert
E. Zarlengo, Jr., as trustee for the Albert E. Zarlengo
Trust; Bell South Corporation Health Care Trust; J.
Magness, Inc.; SG Interests I, Ltd; Mosbacher U.S.A.,
Inc.; Land Owners Coalseam Committee, Defendants-Appellees,
and
Meridian Oil, Inc.; Pablo Operating Company; Tiffany Gas
Company, Union Texas Petroleum Corporation, John Doe oil
company and all other unknown persons or entities claiming
leasehold working interests or operating rights to explore
for, produce or develop coalbed methane or coal constituents
from coal or coal strata reserved by the United States in
patents issued under The Act of June 22, 1910, for lands
located within the exterior boundaries of the Southern Ute
Indian Reservations, and which entities have not obtained
tribal consent to and federal approval of said exploration,
production of development activities, Defendants.
Independent Petroleum Association of Mountain States; La
Plata County, Board of County Commissioners; La Plata
County Cattlemen's Association; National Association of
Royalty Owners; Campbell County Wyoming Mineral Owners,
Ignacio School District 11 JT; Bayfield School District 10
JT-R, Amici Curiae.
 No. 94-1579.
 United States Court of Appeals,
Tenth Circuit.
 July 20, 1998.
 
 Thomas H. Shipps, Maynes, Bradford, Shipps & Sheftel, Durango, Colorado (Scott B. McElroy and Alice E. Walker, Greene, Meyer & McElroy, P.C., Boulder, Colorado, and Michael T. McConnell, Long & Jaudon, Denver, Colorado, with him on the briefs), for Plaintiff-Appellant.
 Charles L. Kaiser, Davis, Graham & Stubbs L.L.P., Denver, Colorado (Anthony J. Shaheen and Ezekiel J. Williams, Davis, Graham & Stubbs L.L.P., Denver, Colorado, and David E. Brody, Amoco Production Company, Denver, Colorado, with him on the brief), for Amoco Production Company, Defendant-Appellee.
 Before SEYMOUR, Chief Judge, PORFILIO, ANDERSON, TACHA, BALDOCK, KELLY, HENRY, and BRISCOE, Circuit Judges, and MCKAY, Senior Circuit Judge.*
 SEYMOUR, Chief Judge.
 
 OPINION ON REHEARING EN BANC
 
 1
 This case arose from the relatively recent development of technology that has made coal bed methane (CBM) commercially valuable. The Southern Ute Indian Tribe (the Tribe) appealed the district court's grant of summary judgment to defendants Amoco Production Company and others on the Tribe's claim to ownership of coal bed methane contained in coal acquired by the Tribe as successor in interest to a statutory reservation of coal to the United States. The Tribe also appealed the district court's grant of summary judgment to the Secretary of the Interior, the Department of the Interior, and the Department of the Interior's subordinate agencies (the federal defendants) on the Tribe's claim of breach of fiduciary duty. A panel of this court reversed the district court on the issue of CBM ownership and remanded for further proceedings consistent with its decision. See Southern Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d 816 (10th Cir.1997). Amoco requested rehearing en banc which we granted in part as set out below.
 
 I.
 
 2
 In 1991, the Tribe brought suit against Amoco Production Company, other oil companies, and individual oil and gas lessees and lessors (the Amoco defendants) who asserted ownership interests in CBM contained in coal owned by the Tribe. In its First Amended Complaint, the Tribe claimed ownership of CBM and asserted that various Amoco defendants, by exploring for and extracting CBM under oil and gas leases, had among other things: 1) trespassed on Tribal lands; 2) trespassed on Tribal coal; 3) converted Tribal coal; 4) failed to pay severance tax to the Tribe; and 5) in collusion with State of Colorado officials, deprived the Tribe of federally guaranteed rights in violation of 42 U.S.C. § 1983. The Tribe sought a variety of remedies including: 1) a declaratory judgment vesting in the Tribe ownership of CBM and other substances contained in Tribal coal; 2) a declaratory judgment that Tribal consent is required for CBM extraction; 3) an order quieting title to CBM in the Tribe; 4) injunctive relief to prevent continued exploration and production of CBM without Tribal consent; 5) damages for present and future injuries to coal, for extraction of CBM, for conversion of coal, for civil rights violations, and for failure to pay severance taxes; 6) title to all exploration and production facilities on Tribal lands which, if removed, would interrupt production of CBM; and 7) costs and attorney's fees.
 
 
 3
 The Tribe also sued the federal defendants in their capacities as trustees for the Tribe. The Tribe claimed that the federal defendants breached their fiduciary duties to the Tribe by allowing exploration and extraction of CBM under oil and gas leases. The Tribe sought a declaratory judgment on the breach of fiduciary duty issue, and sought injunctive relief to prevent the federal defendants from issuing permits to explore for and extract CBM under oil and gas leases or from otherwise acquiescing in the derogation of the Tribe's alleged ownership interest in CBM.
 
 
 4
 Two issues were identified as fundamental to the resolution of all claims against the Amoco defendants: 1) the determination of CBM ownership, and 2) the existence of and applicability of defenses based on acts or omissions of the Tribe. Since resolution of either issue in favor of the Amoco defendants would settle all claims, the district court granted a joint motion by the Tribe and Amoco to bifurcate these issues. The parties then moved to certify "a defendant class comprised of all persons, except the Tribe and governmental entities, who claim an ownership interest in the coalbed methane" for the purposes of resolving the bifurcated issues. Aplt.'s App., vol. I at 214. Amoco was designated as representative of the class and, in that capacity, brought a motion for summary judgment on the bifurcated issues. Id., vol. II at 353.
 
 
 5
 The federal defendants supported the Amoco defendants' claim of ownership of CBM and asserted accordingly that they had no fiduciary duty to manage an asset for the Tribe which it did not own. The federal defendants filed a motion for summary judgment based on the Tribe's nonownership of the CBM. In the alternative, they moved to dismiss the Tribe's action as time-barred. Id. at 365. The Tribe brought a cross-motion for summary judgment on the issue of CBM ownership.
 
 
 6
 The district court held that CBM ownership was vested unambiguously in the Amoco defendants. Southern Ute Indian Tribe v. Amoco Prod. Co., 874 F.Supp. 1142, 1160 (D.Colo.1995). Consequently, the court concluded it "need not address further the application of the common defenses to the ownership question," id. at 1160, or reach the federal defendants' claims that the Tribe's action was barred by the statute of limitations, id. at 1161. It then granted summary judgment to the Amoco defendants on the issue of CBM ownership, and to the federal defendants on the "issue of breach of fiduciary duty for failure to manage the CBM gas," leaving for later determination other issues concerning fiduciary duty. Id. The court denied the Tribe's motion for summary judgment. Id.[1]
 
 
 7
 On appeal, the panel concluded in Part II A that the Coal Land Acts of 1909 and 1910, which reserved coal to the United States, do not by their plain language reveal congressional intent with respect to CBM. See Southern Ute, 119 F.3d at 821-22. The panel held in Part II B that the Acts, viewed in historical perspective, are ambiguous regarding Congress' specific intent to include or exclude CBM in the reservation of coal. Id. at 822-24. Finally, in Part II C the panel addressed general congressional intent and was persuaded that Congress neither unambiguously included or excluded coal bed methane when it reserved the coal to the United States. In light of the Acts' historical context and the absence of a clear conveyance of CBM to the surface patentees, coupled with the principle of statutory construction that resolves ambiguity in favor of the sovereign, the panel concluded that CBM was reserved to the United States along with the coal. Id. at 826. In Part II D the panel addressed and rejected defendants' contention that deference was due to a contrary opinion issued by the Solicitor of the Department of the Interior in 1981 entitled Ownership of and Right to Extract Coalbed Methane Gas in Federal Coal Deposits, 88 Interior Dec. 538 (1981). The panel held that deference was not appropriate under either Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). See Southern Ute, 119 F.3d at 829-36. Finally, in Part III, the panel pointed out that, in light of its reversal, further proceedings would be required on the resolution of important issues concerning the class action defenses to the Tribe's ownership of CBM which the district court held were mooted by its decision in favor of the Amoco defendants. Id. at 836.
 
 
 8
 Amoco petitioned for rehearing en banc. We granted rehearing limited to the issue of whether "coal" as used in the Coal Land Acts of 1909 and 1910 unambiguously excludes or includes CBM.[2] We now hold, in accordance with the panel opinion, that those statutes are ambiguous. Under the long-standing principle that property grants are construed favorably to the sovereign, we conclude the reservation of coal to the United States in the 1909 and 1910 Acts must be construed to include the ownership of CBM. In so holding, we adopt Parts II A, B, and C of the panel opinion in substantial part as modified below. The question of deference to the 1981 Solicitor's opinion was not reconsidered by the en banc court and we therefore do not disturb the panel's disposition of that issue in Part II D of its opinion.
 
 II.
 
 9
 The single issue which is determinative of this appeal is whether the Tribe, as successor in interest to a statutory reservation of coal to the United States made in the coal lands acts of 1909 and 1910, is also the owner of CBM, a gaseous substance contained in coal. "We review a grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c)." Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir.1995). Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is due judgment as a matter of law. Id. We construe the facts and record in the light most favorable to the party opposing the motion. Id. "We also review de novo the district court's interpretation of a federal statute." Id.; see also Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1393 (10th Cir.1990).
 
 
 10
 Determination of CBM ownership where the Tribe has acquired its coal via a statutory reservation to the United States presents a question of statutory interpretation. The purpose of statutory construction is to determine congressional intent. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("Our task is to give effect to the will of Congress...."). We must decide whether Congress intended to reserve CBM to the United States (and thus to the Tribe as its successor in interest) as part of the coal reservations in the 1909 and 1910 Acts, or whether Congress intended that CBM be treated as part of the unreserved estate (belonging to the Amoco defendants' predecessors in interest).
 
 
 11
 Of critical importance is the long recognized principle of statutory construction, applicable here, that "ambiguity or uncertainty in the terms employed [in land grants] should be resolved in favor of the government." Burke v. Southern Pac. R.R. Co., 234 U.S. 669, 680, 34 S.Ct. 907, 58 L.Ed. 1527 (1914). It is an " 'established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.' " Watt v. Western Nuclear, Inc., 462 U.S. 36, 59, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983) (quoting United States v. Union Pac. R.R. Co., 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957)) (emphasis added) (concluding that gravel is included in mineral reservation to the United States). The burden remains on defendants to dispel any ambiguity in the construction of the coal reservation.
 
 A. Plain Meaning of the Statutes
 
 12
 "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). "In interpreting statutes, we begin with the relevant language." Aulston v. United States, 915 F.2d 584, 589 (10th Cir.1990). Where the will of Congress "has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.' " Griffin, 458 U.S. at 570, 102 S.Ct. 3245 (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)).
 
 
 13
 The relevant part of the 1909 Act states that "any person who has in good faith located, selected, or entered under the nonmineral land laws of the United States any lands which subsequently are classified ... as being valuable for coal, may ... upon making satisfactory proof of compliance with the laws under which such lands are claimed, receive a patent therefor, which shall contain a reservation to the United States of all coal in said lands, and the right to prospect for, mine, and remove the same." Law of Mar. 3, 1909, ch. 270, 35 Stat. 844 (current version at 30 U.S.C. § 81) (emphasis added) (hereinafter the 1909 Act).[3] The 1910 Act similarly states that prospective homesteaders on coal lands may obtain a patent which "shall contain a reservation to the United States of all the coal in the lands so patented, together with the right to prospect for, mine, and remove the same." Law of June 22, 1910, ch. 318, § 3, 36 Stat. 584 (current version at 30 U.S.C. § 85) (hereinafter the 1910 Act).[4]
 
 
 14
 The Acts neither define coal nor mention CBM; thus, the statutes do not by their plain language indicate congressional intent regarding CBM. Even in the absence of a plain articulation, however, we have other means available to evaluate congressional intent. See generally INS v. Cardoza-Fonseca, 480 U.S. 421, 431-48, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Following this circuit's traditional approach as developed in Northern Natural Gas Co. v. Grounds, 441 F.2d 704 (10th Cir.1971), and followed in Aulston, 915 F.2d at 589-599, we use traditional tools of statutory construction to investigate whether inclusion of CBM in the coal reservation was either specifically intended by Congress, or is consistent with Congress' general legislative purpose in enacting the 1909 and 1910 Acts.
 
 B. Specific Congressional Intent
 
 15
 Congress' specific intent to include or exclude CBM in its reservation of coal must be judged from the perspective of Congress at the time of enactment of the 1909 and 1910 Acts. The Amoco defendants and the dissent contend we can easily discern Congress' specific intent from that perspective. First, citing many contemporaneous dictionary definitions of coal, they argue that in 1909 coal was typically defined as a solid rock, without specific mention of gaseous constituents. Second, they contend that in 1909 Congress was aware of CBM as a hazardous gaseous byproduct of coal and could specifically have retained the CBM by inserting the word "gas" in the mineral reservation had it so wished. From these facts defendants and the dissent conclude that Congress' use of the word "coal" in its mineral reservation was not inadvertent, and that Congress specifically chose to reserve only solid rock coal. We disagree with Amoco and the dissent for a number of reasons.
 
 
 16
 First, Amoco and the dissent focus solely on the word "coal" and totally ignore what is apparent from the face of the statutes: the coal was reserved from patents issued to land claimants under land grants of "non-mineral" lands to homesteaders; the lands had been "classified, claimed, or reported as being valuable for coal;" and the reservation of coal included "the right to prospect for, mine, and remove the same." See 1909 Act. See also 1910 Act. Statutes must be read in their entirety, with each term considered in light of its context and the purposes of the act. See Gustafson v. Alloyd Co., 513 U.S. 561, 574-78, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).
 
 
 17
 As explained more fully below, "Congress' underlying purpose in severing the surface estate from the [coal] estate was to facilitate the concurrent development of both surface and subsurface resources." Western Nuclear, Inc., 462 U.S. at 47, 103 S.Ct. 2218 (construing Stock-Raising Homestead Act of 1916, which reserved to the government "all the coal and other minerals"). The public lands governed by the 1909 and 1910 Acts were lands identified by the government as primarily valuable for coal, not as primarily valuable for other minerals or for homesteading. See generally id. at 47--52, 103 S.Ct. 2218. The text of each Act makes clear that the coal was being reserved for subsequent mining and removal. Congress also plainly expected that these lands would be used by settlers for homesteading, with no apparent concern regarding future mining for other minerals. The title of the 1910 Act is particularly instructive in this regard: "An Act To provide for agricultural entries on coal lands." See n. 4 supra. See also Western Nuclear, Inc., 462 U.S. at 53, 103 S.Ct. 2218.
 
 
 18
 Second, while contemporaneous dictionary definitions of words in a statute are relevant, see Smith v. United States, 508 U.S. 223, 228-29, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), the existence of alternative dictionary definitions may themselves indicate that the statute is ambiguous, see National R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 418, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). Although as the dissent points out, "coal" was sometimes defined as a solid, combustible material, see dissent at 3, it was also defined much more broadly in many contemporaneous dictionaries and encyclopediae. For example, the NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 508 (1913 ed.) defined "coal" as:
 
 
 19
 An amorphous substance derived from the vegetation of prehistoric ages, containing different hydrocarbons with sometimes free carbon and also complex substances carrying oxygen and nitrogen, found in beds or veins in the earth and used as fuel.
 
 
 20
 Methane was considered a hydrocarbon in 1909 and squarely falls within the description of coal components set forth in the foregoing definition of coal. See VI THE CENTURY DICTIONARY 3740 (1914) (methane a hydrocarbon with chemical formula of CH4).
 
 
 21
 It was widely recognized in 1909 that coal contains gaseous constituents:
 
 
 22
 Hydrocarbons, such as petroleum, bitumen, paraffin, & c., are also found occasionally in coal.... Gases, consisting principally of light carburetted hydrogen or marsh gas [CBM], are often present in considerable quantity in coal, in a dissolved or occluded state....
 
 
 23
 VI ENCYCLOPAEDIA BRITANNICA 575 (11th ed.1910).[5] Because of its "amorphous" nature and "variable composition," coal "cannot be as strictly defined as a crystallized or definite mineral can." Id.; accord III AMERICANIZED ENCYCLOPAEDIA BRITANNICA 1643 (1890) (same definition of coal). These definitions of coal were consistent with earlier ones, which characterized "coal" as "embrac[ing] all classes of mineral fuel that will ignite and burn with flame or incandescent heat .... [of which] [t]he prominent varieties are denominated anthracite and bituminous coal." IV THE AMERICAN CYCLOPAEDIA: A POPULAR DICTIONARY OF GENERAL KNOWLEDGE 726 (Ripley and Dana eds., 1873). In bituminous coal "hydrogen is the predominating element, in its [coal's] gaseous or volatile constituents, though both oxygen and hydrogen are generally present in such coals in nearly equal parts." Id. (corresponding to methane's molecular identification as CH4). Additionally,
 
 
 24
 The combinations of carbon, hydrogen, oxygen, and nitrogen with earthy impurities, to which the term mineral fuel [coal] may be properly applied, are infinite, ranging through all the grades of coal, from the hard, dense anthracite to the asphaltic varieties, and from the solidified petroleum to the gaseous naphtha.
 
 
 25
 Id. The common understanding that coal was a heterogenous, complex substance counsels against acceptance of the limitations defendants and the dissent promote by their characterization of coal as simply "the solid rock."
 
 
 26
 Moreover, we are persuaded there was enough undisputed information about the unique nature of CBM itself to indicate that even if Congress intended to retain only solid rock coal, Congress in 1909 may have considered CBM to be part of that solid coal.[6] The broad contemporaneous definitions of coal quoted above showing that the reserved coal actually contained CBM in an occluded state support this conclusion. CBM is generated as part of the chemical and physical processes which convert carbon-rich sediments into solid coal (coalification). J. Hovey Kemp & Kurt M. Petersen, Coal-Bed Gas Development in the San Juan Basin: A Primer for the Lawyer and Landman, 1988 ROCKY MTN. ASS'N OF GEOLOGISTS 257, 259. It is trapped by adsorption[7] "on the internal surface of micropores," and as "free gas in cracks and fractures."[8] Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits, 88 Interior Dec. 538, 540 n. 11 (1981) (quoting Deul, Methane Drainage from Coal Beds, A Program of Applied Research, 60 ROCKY MTN. COAL MINING INST. 13 (1964)).
 
 
 27
 Although CBM in a gaseous state can be produced from coal, prior to that production most CBM is not sufficiently like other natural gases[9] for us to conclude that Congress in 1909 unambiguously intended the owners of other natural gases to also own CBM associated with the reserved coal. The adsorbed component of CBM is molecularly attracted to coal and cannot be released without an alteration in the physical state of the coal. In fact, release of either adsorbed or fracture-trapped CBM requires production techniques which often cause significant damage to the coal.[10] CBM ownership, therefore, cannot be disposed of by the simple tautology that gas is gas and coal is coal.[11] We are concerned not with the physical state of the substance as gas at the surface as it is now produced by modern technology, but rather with its physical state prior to extraction, as trapped in coal and economically inseverable in 1909. Even assuming that Congress specifically intended to retain only solid rock coal, CBM is so intimately associated with coal that Congress in 1909 could certainly have considered it part of the solid rock.[12] Indeed, it seems to us quite unlikely that Congress, if it had considered the matter, would have reasoned, "We want the Government to hold on to the solid bituminous core of these coal deposits, but we make no claim to the thin layer of molecules of CBM which coats the surfaces."
 
 
 28
 In addition, we disagree that a specific intent to retain only solid rock coal was evinced by Congress' awareness that CBM was released as a hazardous byproduct of coal mining. CBM was not readily severable from coal in 1909 even though it is now "potentially severable" through application of advanced drilling and production technologies.[13] See Kemp & Petersen, supra, at 261 ("Due to technical advances and changes in the world energy supply, the recovery and utilization of coal-bed gas now appears to be more feasible."). It is not reasonable to impute to Congress a desire to retain only solid rock coal constituents and to convey gaseous coal constituents when CBM is an integral component of coal and in 1909 there appears to have been no technology by which a patent holder could extract and capture CBM from coal without damaging or destroying the coal. Because no effective means existed in 1909 to remove adsorbed CBM leaving the coal behind, CBM physically trapped in coal was necessarily retained with the coal reservoir.
 
 
 29
 The fact that CBM could not be commercially extracted from coal in 1909 indicates to us it is inappropriate to conclude that Congress unambiguously intended a specific result one way or the other regarding CBM by its use of the word "coal." Rather, we conclude that where the commercial value of CBM was unappreciated at the time of the enactment, the text of these acts gives us no particular indication of Congress' specific intent with regard to that asset. See United States v. Union Oil Co. of California, 549 F.2d 1271, 1273 (9th Cir.1977) ("Congress was not aware of geothermal power when it enacted the Stock-Raising Homestead Act in 1916; it had no specific intention either to reserve geothermal resources or to pass title to them."); Northern Natural Gas, 441 F.2d at 714-15 (no specific intent to exclude helium will be inferred where lessors neither knew of presence nor appreciated value of helium gas); cf. Aulston, 915 F.2d at 594, 599 (rejecting argument that use of "gas" in mineral reservation evinced a specific congressional intent to exclude carbon dioxide from a gas reservation, when inclusion comported with general intent of statute and value of carbon dioxide was not appreciated at time of mineral reservation).
 
 
 30
 The Amoco defendants and the dissent make much of the fact that split mineral estates were recognized and protected on private lands when Congress created the first split mineral estates on public lands by the 1909 Act. They rely on Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597 (1893), which held that the oil and gas owner is entitled to drill through coal owned by another to reach the underlying gas. Defendants and the dissent refuse to acknowledge, however, that ninety years later the Supreme Court of Pennsylvania, citing Chartiers, issued the seminal decision on CBM ownership in United States Steel Corp. v. Hoge, 503 Pa. 140, 468 A.2d 1380 (1983). In holding that the CBM present in coal belongs to the owner of the coal estate rather than to the surface owners who reserved the gas, the court in Hoge observed in relevant part as follows:
 
 
 31
 Coalbed gas is always present in coal seams; its molecules are absorbed in micropores of coal, and even the smallest particle of coal always contains, and when exposed emits, some coalbed gas. Coal and coalbed gas are, nevertheless, separate physical entities.
 
 
 32
 The gas which has commonly been referred to as "natural gas" is generally found in strata deeper than coal veins, though it shares many of the characteristics of coalbed gas. Both gases evolved, through natural processes, from carbonaceous material beneath the earth's surface, and both contain mixtures of various hydrocarbons, including methane, ethane, propane, butane, carbon dioxide, carbon monoxide, and hydrogen sulfide. Both are, as are all gases, migratory, thus being capable of escaping their natural habitats to enter other strata, and both are found in the same geographic areas of Pennsylvania. Due to its fugacious character, natural gas is capable, under certain circumstances, of commingling with coalbed gas in the upper strata.
 
 
 33
 Id. at 1382.
 
 
 34
 Gas is a mineral, though not commonly spoken of as such, and while in place it is part of the property in which it is contained, as is the case with other minerals within the bounds of a freehold estate. Gas necessarily belongs to the owner in fee, so long as it remains part of the property; ownership in it will be lost only upon grant or upon the gas leaving the property through migration....
 
 
 35
 Thus, as a general rule, subterranean gas is owned by whoever has title to the property in which the gas is resting. When a landowner conveys a portion of his property, in this instance coal, to another, it cannot thereafter be said that the property conveyed remains as part of the former's land, since title to the severed property rests solely in the grantee. In accordance with the foregoing principles governing gas ownership therefore, such gas as is present in coal must necessarily belong to the owner of the coal, so long as it remains within his property and subject to his exclusive dominion and control. The landowner, of course, has title to the property surrounding the coal, and owns such of the coalbed gas as migrates into the surrounding property.
 
 
 36
 Id. at 1383 (citations omitted) (emphasis added).
 
 
 37
 The owner of coal may, as may any property owner, exercise dominion over his property so as to maximize his right of enjoyment thereover, within bounds limiting impingement upon the rights of other property owners. Hence, the coal owner may mine his coal, extract the gas from it, or both. If he chooses to extract the gas, drilling as well as hydrofracturing are available means, so long as their utilization does not impinge upon the rights of owners of the surrounding property, since the damage to coal inflicted by these processes is within his dominion to inflict.
 
 
 38
 Id. at 1384 (citations omitted).[14] The majority of other states addressing the issue have also held that ownership of CBM is in the coal owner. See NCNB Texas Nat'l Bank, N.A. v. West, 631 So.2d 212 (Ala.1993) (coal owner owns CBM contained in coal, and gas owner owns CBM which has migrated away from the coal reservoir); Vines v. McKenzie Methane Corp., 619 So.2d 1305 (Ala.1993) (ownership of CBM included in grant of "all coal"); Rayburn v. USX Corp., No. 85-G2661-W, 1987 U.S. Dist. LEXIS 6920 (N.D.Ala. Jul. 28, 1987) (coal owner, USX, is owner of right to explore for and to extract occluded CBM where grantor of deed retained only oil and gas rights). But cf. Carbon County v. Union Reserve Coal Co., 271 Mont. 459, 898 P.2d 680 (1995) (right to extract CBM is with holder of gas exploration rights).
 
 
 39
 In summary, given that CBM was not commercially severable in 1909 and thus had no value, and given the uncertainty that Congress would have viewed adsorbed CBM as a component distinct from solid rock coal, we cannot conclude that Congress formed a specific intent to convey CBM as a gas. As a consequence, we are persuaded that the 1909 and 1910 Acts are ambiguous with respect to Congress' specific intent regarding CBM. Cf. Western Nuclear, Inc., 462 U.S. at 56, 103 S.Ct. 2218 (noting that the term "mineral" is ambiguous with respect to congressional intent to reserve gravel as a mineral). In the absence of specific congressional intent, we look at the general purpose of the statute and the historical context in which it was enacted to determine whether we can discern general congressional intent. Aulston, 915 F.2d at 598. "General intent should be discovered ... by considering the purposes of the grant in terms of enjoyment of the rights created." Northern Natural Gas, 441 F.2d at 714. "In our opinion general intent is closer to original intent than is specific intent which blossoms when a component previously regarded as an impurity becomes valuable." Id. at 715.
 
 C. General Congressional Intent
 
 40
 "In interpreting the relevant [statutory] language ... we look to the provisions of the whole law, and to its object and policy." Aulston, 915 F.2d at 589; see also United States v. Colorado, 990 F.2d 1565, 1575 (10th Cir.1993). "[W]e look at not only the statute itself but also at the larger statutory context. We may ascertain the intent of Congress through statutory language and legislative history." Utah v. Babbitt, 53 F.3d at 1148 (citations omitted).
 
 1. History
 
 41
 To understand the general congressional intent behind the 1909 and 1910 Acts, we review the historical context in which they were enacted, including the history of the Southern Ute Tribe's acquisition of its reservation lands and the United States' reservation of the coal it ultimately conveyed to the Tribe. We begin in the latter half of the nineteenth century with the formation of the Southern Ute Indian Reservation.
 
 
 42
 The Ute Indian Reservation was established in 1864, when the Uncompahgre, White River and Southern Utes "exchanged their aboriginal lands in New Mexico, Utah, and Colorado for ... approximately 15.7 million acres ... within Colorado." United States v. Southern Ute Tribe or Band of Indians, 402 U.S. 159, 162, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971). The reservation did not long remain intact. In 1874, 3.7 million acres of the reservation were ceded to the United States upon discovery of mineral resources on reservation land. Id. In 1880, the remaining reservation land was ceded to the United States in return for individual allotments and "shares in the proceeds of unallotted land sales." Id. at 164, 91 S.Ct. 1336 (quoting United States v. Southern Ute Tribe or Band of Indians, 191 Ct.Cl. 1, 423 F.2d 346, 350 (1970)). The Uncompahgre and White River Utes left the reservation before 1882. Id. at 162, 91 S.Ct. 1336.
 
 
 43
 After the cession of reservation land, the United States opened the ceded, non-allotted reservation to homesteading and mineral exploration under the terms and conditions of a variety of federal statutes. Amoco Prod. Co., 874 F.Supp. at 1148 (citing the Homestead Act of 1862, 43 U.S.C. §§ 161 et seq. (repealed 1976), the Coal Lands Act of 1873, 17 Stat. 607, and the Mining Law of 1872, 30 U.S.C.A. § 22). At that time, "the disposition of land owned by the United States depended upon whether it was classified as mineral land or nonmineral land, and title to the entire land was disposed of on the basis of th[at] classification." Western Nuclear, Inc., 462 U.S. at 47, 103 S.Ct. 2218. Because the United States Geological Survey had insufficient resources to evaluate the mineral character of each land parcel before patent issuance, it often depended on the attestation of a patent applicant to determine the character of his land. Id. at 48 n. 9, 103 S.Ct. 2218. Although this honor system for patent evaluation inevitably led to considerable abuse, agricultural settlement and mineral exploration of reservation lands and other areas in the western United States proceeded for several decades under this system.
 
 
 44
 In 1906, President Roosevelt withdrew from homesteading or mineral patenting approximately 64 million acres considered to be valuable for coal resources, including the ceded, non-allotted Ute Reservation lands. Id. at 48-49, 103 S.Ct. 2218 (citing 41 CONG. REC. 2615 (1907)). Two concerns drove the withdrawal of coal lands: first, the government wished to end the issuance of patents in reliance on an entrant's attestation of the mineral character of the land; and second, the government wished to encourage optimal land use by ensuring that lands valuable for mineral resources would not be held unavailable for mineral exploration by homesteading claims. Id. In his Sixth Annual Message to the nation, President Roosevelt explained that the withdrawal was necessary to preserve ownership of coal resources in the United States and to ensure price control of coal and disposition of the coal resources "under conditions which would inure to the benefit of the public as a whole." PRESIDENT THEODORE ROOSEVELT, SIXTH ANNUAL MESSAGE (Dec. 3, 1906), reprinted in XV THE WORKS OF THEODORE ROOSEVELT 363 (1926).
 
 
 45
 The 1906 withdrawal included lands on which the process of homesteading (holding the land for a term of years in agricultural use in return for a land patent) had begun. Homesteaders who had entered the land in good faith, believing the land to be of nonmineral character, were disenfranchised by the withdrawal. To remedy that disenfranchisement while preserving the value of coal for future use of the United States, Congress enacted the 1909 Act. That act permitted existing good faith agricultural entrants whose land had been subject to the 1906 withdrawal to receive patents for those lands subject only to a "reservation to the United States of all coal in said lands." 30 U.S.C. § 81. In 1910, Congress enacted a similar statute for the protection of prospective agricultural entrants to federal lands. Under the protection of these Acts, the Amoco defendants' predecessors in interest claimed patents to land subject only to the reservation of coal in the United States.
 
 
 46
 Homesteading and mineral exploration proceeded under these statutes until 1934, when Congress changed its policy toward Indian Tribes and passed the Indian Reorganization Act (IRA), 25 U.S.C. §§ 463-479, which restored to tribal ownership some lands previously taken by the federal government. Congress provided that "[t]he Secretary of the Interior, if he shall find it to be in the public interest, is authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation opened before June 18, 1934," subject to any outstanding rights or claims. Id. § 463(a). In 1938, pursuant to the 1934 Act, equitable title to coal held by the federal government on the Southern Ute Reservation was returned to the Tribe, subject to outstanding homestead patents. Amoco Prod. Co., 874 F.Supp. at 1151.
 
 2. Analysis
 
 47
 With this background, we turn to the general intent behind the 1909 and 1910 Acts. Defendants argue and the district court agreed, id. at 1155-59, that, in attempting to preserve coal lands for the benefit of the public as a whole and to remedy the negative impacts of the 1906 land withdrawals, Congress specifically considered and rejected a broad reservation of all minerals. From that rejection, defendants contend, we should infer that Congress knowingly chose the most narrow possible meaning of coal. Defendants rely on a passage of debate between a member of the House of Representatives from Texas and the Chairman of the Committee on Public Lands concerning the intended mineral reservation:
 
 
 48
 Mr. STEPHENS of Texas. Could the gentleman better arrive at what he desires by only patenting the surface of the land and reserving all minerals, precious and otherwise?
 
 
 49
 Mr. MONDELL. That has been discussed at some length, and the Committee on Public Lands is not of the opinion that that ought to be done. We believe this is quite a sufficient departure from the past practice of the Government. The lands which this legislation will affect are lands which the department has claimed contain some coals of value.
 
 
 50
 43 CONG. REC. 2504 (1909) (emphasis added). Even bearing in mind the admonition that legislative history should be treated cautiously, Exxon Corp. v. Lujan, 970 F.2d 757, 761 (10th Cir.1992), it is clear that Congress recognized in 1909 it had the option to reserve "all minerals" and rejected that option.
 
 
 51
 Congress' rejection of an "all minerals" reservation, however, does not inform us about Congress' intent regarding the extent of the reservation of a single substance, "coal." Moreover, the quoted exchange between Representatives Stephens and Mondell does not bear the weight defendants would have us give it because the Committee affirmatively considered and rejected several other options, including no reservation of coal. Aplt.'s App., vol. VI at 1275, Hearings on Coal Lands and Coal-Land Laws of the United States Before the House Committee on Public Lands, 59th Cong., 2d. Sess. 17 (Dec. 17, 1906) (hereinafter Hearings ) (statement of Edgar E. Clark) (considering the use of government-imposed railroad rates to retain control of coal supply). The Committee also discussed and rejected the possibility of retaining only ownership of coal which was marketable in 1907. Aplt.'s App., vol. VI at 1286, Hearings, at 15 (Jan. 9, 1907) (statement of Marius R. Campbell); id. at 1281 (noting that the western coals at issue in this case were not mineable at that time and were "inferior to the eastern coals, particularly from a steaming and coking standpoint").
 
 
 52
 Rather than adopt any of those options, Congress chose to reserve "all the coal." Id. at 1287 (The "only really effective way to retain the balance of the coal in the public domain in public ownership ... [was to] reserve the coal under the surface of all of the land. That would effectively retain in public ownership all the coal."). In so doing, the Committee was specifically informed it would retain coal that was not presently valuable, but which could become valuable in the future. Id. at 1281 ("[W]hat may not be coking [valuable] coal to-day may be coking coal to-morrow; because there are improvements going on."); id. at 1282 ("these [coals] may have a much greater value in the future").[15]
 
 
 53
 It is apparent from the legislative history of the 1909 and 1910 Acts that Congress understood it had the option to reserve to the United States only coal having current economic value, and rejected that narrow mineral reservation. Congress knew there was indeterminate potential value in the reserved coal and intended to secure that value for the United States.[16] Rather than indicating a limited reservation of coal to the United States, the legislative history suggests that Congress adopted an interpretation of coal which encompassed both the present and future economic value of coal for energy purposes, including value that could only be realized through advances in technology such as those which drive the present day exploration for CBM.
 
 
 54
 We cannot discern from the statute as a whole or the historical context in which it was drafted any unambiguous intention either to convey CBM to the surface patentees,[17] or to retain it. Congress' broad general intent and the absence of a clear conveyance of CBM to the surface patentees, coupled with the principle of statutory construction that resolves ambiguity in favor of the sovereign, however, persuades us that CBM was reserved to the United States.
 
 3. Related Statutes
 
 55
 Our conclusion that the reservation of coal should include CBM is buttressed by the interpretation given to analogous statutory mineral reservations. The same principle we rely on here, that ambiguity or uncertainty in the terms employed in land grants should be resolved in favor of the government, has been a subtext in the interpretation of many similar statutes reserving minerals to the United States.
 
 
 56
 In 1914, Congress enacted the Agricultural Entry Act, 30 U.S.C. §§ 121-125 (hereinafter the 1914 Act), reserving "phosphate, nitrate, potash, oil, gas, or asphaltic minerals" to the United States, id. § 121. Then in 1916, Congress enacted the Stock-Raising Homestead Act, 43 U.S.C. §§ 291-301 (hereinafter the 1916 Act), which reserved to the United States "all the coal and other minerals," id. § 299. Uniformly, courts have treated these mineral reservations expansively. Western Nuclear, Inc., 462 U.S. at 60, 103 S.Ct. 2218 ("gravel is a mineral reserved to the United States in lands patented under" the 1916 Act); Aulston, 915 F.2d at 585 (reservation of "gas" in the 1914 Act includes carbon dioxide); Union Oil Co., 549 F.2d at 1279 (geothermal energy included in 1916 Act's reservation of "all the coal and other minerals"); Brennan v. Udall, 379 F.2d 803, 804 (10th Cir.1967) (oil shale included in 1914 Act reservation of oil). Although the language employed in the 1914 and 1916 reservations is more expansive and admits more variety in type and character of mineral reservation than the language used in the 1909 and 1910 Acts, judicial interpretations of these statutes have reached for the outer limits of reasonable construction in favor of the sovereign. A particularly notable example is one court's classification of geothermal energy (hot water and steam) as a "mineral." Union Oil Co., 549 F.2d at 1279. In fact, we have found no occasion in which a reservation of a mineral asset to the United States has been treated narrowly to exclude a newly appreciated value associated with that mineral; the cases cited above offer no support for doing so now.[18]
 
 4. Summary
 
 57
 In summary, the direct legislative history of the coal lands acts indicates that Congress intended a reservation of coal that encompassed both the present and future economic value of coal. Congress was aware that full economic realization of that benefit would require advances in technology. Present day exploitation of CBM is a benefit of coal ownership that is consistent with Congress' general statutory intent. Given the absence of value attributed to CBM in 1909 and 1910 and the danger it presented to coal miners, we cannot infer that Congress unambiguously intended to convey to the surface patent holder a component of coal which could not be severed at the time of the statutes' enactments except in the process of mining the coal itself.
 
 III
 
 58
 For the foregoing reasons, we hold that "coal" as used in the Coal Land Acts of 1909 and 1910 neither unambiguously includes or excludes coal bed methane. Given the established principle that all doubts respecting land grants and mineral reservations are construed in favor of the government, see Watt v. Western Nuclear, Inc., 462 U.S. at 59, 103 S.Ct. 2218, we conclude that coal reserved to the United States in the 1909 and 1910 Acts includes the adsorbed CBM.
 
 
 59
 The judgment of the district court is REVERSED and the case is REMANDED for further proceedings.[19]
 
 
 60
 TACHA, Circuit Judge., dissenting.
 
 
 61
 The majority finds that when Congress used the word "coal" in 1909 and 1910, it may have been referring not only to the solid rock we all understand coal to be, but also a gas by-product of coal, some of which seeps into nearby rock and some of which remains in the air pockets or cracks in the coal. Because coal was not understood, either in 1909 or today, to include a gas, I respectfully dissent.
 
 I.
 
 62
 This appeal hinges on a single question of statutory interpretation: does the federal government's reservation of coal in the Coal Lands Acts of 1909 and 1910 include coalbed methane (CBM), a gas that exists in and around coal deposits?
 
 
 63
 When interpreting statutory terms, "[o]ur task is to give effect to the will of Congress." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). Of course, the most persuasive evidence of Congress's will are the words that Congress used in the statute itself. See United States v. American Trucking Ass'ns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Finley v. United States, 123 F.3d 1342, 1347 (10th Cir.1997) (en banc). Therefore, perhaps the most basic rule of statutory construction is that when the language of a statute has a reasonably plain meaning, "that language must ordinarily be regarded as conclusive." Griffin, 458 U.S. at 570, 102 S.Ct. 3245 (citations and internal quotation marks omitted); Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990). Only the most extraordinary showing of a contrary legislative intent can justify a departure from the plain meaning of statutory language. See Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984).
 
 
 64
 The plain-meaning rule is a basic consequence of our system of separated government powers, in which judges must yield to the political decisions of legislators. "Deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.' " United States v. Locke, 471 U.S. 84, 95, 105 S.Ct. 1785, 85 L.Ed.2d 64 (quoting Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)). The Judiciary has no license "to soften the clear import of Congress' chosen word whenever a court believes those words lead to a harsh result." Locke, 471 U.S. at 95, 105 S.Ct. 1785.
 
 
 65
 The relevant legislative intent is that of the Congress that passed the disputed provision. See Andrus v. Charlestone Stone Products, Co., 436 U.S. 604, 611, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978); Watt v. Western Nuclear, Inc., 462 U.S. 36, 47, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983) (referring to the meaning of "minerals" in 1916 when interpreting Stock-Raising Homestead Act of 1916). Thus, we must determine the ordinary meaning of "coal" as it was understood in 1909 and 1910, not the present.
 
 
 66
 The majority opinion concludes that "coal" has no plain meaning because the statutes "neither define coal nor mention CBM." See Maj. Op. at 1258. It is well-established, however, that a term need not be defined in a statute in order to have a controlling plain meaning. Instead, when a statute does not define a word, we give that word its ordinary or natural meaning. See Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); Sutton v. United Air Lines, Inc., 130 F.3d 893, 898 (10th Cir.1997). For several reasons, it is plain to me that the ordinary and common meaning of "coal" as Congress understood it in 1909 did not include coalbed methane.
 
 A.
 
 67
 First, the term coal is not ordinarily understood to refer to a gas. "Common and ordinary usage may be obtained by reference to a dictionary." United States v. Roberts, 88 F.3d 872, 877 (10th Cir.1996). As the district court pointed out, the dictionaries and general reference works of the late-nineteenth and early twentieth century uniformly described coal as a solid material. See Southern Ute Indian Tribe v. Amoco Prod. Co., 874 F.Supp. 1142, 1153 (D.Colo.1995) (citing AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 244 (1889) (defining coal as a "black, or brownish black solid, combustible substance consisting ... mainly of carbon"); WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 424 (1920) (defining coal as "a black, or brownish black, solid, combustible mineral substance"); A. FAY, A GLOSSARY OF THE MINING AND MINERAL INDUSTRY 163 (1920) (describing coal as "a solid substance varying in color from dark-brown to black, brittle, combustible, and used a fuel") (emphasis added)); see also E.A.N. ARBER, THE NATURAL HISTORY OF COAL 4 (1912) ("[C]oal is not a mineral but a rock. Coal is as much a rock as sandstones, limestones, granites or marbles.") (emphasis in original). These descriptions of coal as a "solid" are the first indication that the collective understanding of coal in 1909 did not include CBM, a gas.
 
 
 68
 More importantly, the people of 1909 knew of the existence of CBM. CBM is a combustible gas released in the coal mining process. In the early twentieth century, coal miners ventilated mines before entering them to reduce the chance of explosions, used canaries to detect methane levels, and at times even purposefully lit collected gas to remove it from the mines. Despite these efforts, the ignition of CBM in coal mines led to the death of hundreds of coal miners each year. See Rollin T. Chaimberlain, Notes on Explosive Mine Gases and Dusts, U.S. Geol. Surv. Bull. 383, H.R. DOC. NO. 1583, 60th Cong., 2d Sess., at 6 (1909). Because CBM was such an important--and dangerous--aspect of coal mining, it was very much a part of the general knowledge in 1909. It is clear not only that people of the time were aware that CBM existed, but also that they thought of CBM as a gas: one of the common names used for it was "marsh gas."
 
 
 69
 If there had been no knowledge of CBM in 1909, the contemporary definitions of coal as a "solid" would have been ambiguous as to CBM, and the majority would be correct that it is unclear whether the 1909 reservation of "coal" was meant to include only the solid coal rock, or whether it also included the CBM gas contained in and around the coal. It is extremely unlikely, however, that a people as familiar with CBM gas as the people of 1909 would define coal as a "solid" if they also thought of CBM gas as coal. It is much more likely--indeed, it is quite plain--that the 1909 descriptions of coal as a solid, despite the intimate familiarity with CBM, is a further indication that the people did not believe that coal included CBM, a gas.
 
 
 70
 It is axiomatic that gas and solids are two distinct properties, and that one is not thought to include the other. It is illuminating, however, that reference works of the times provided separate, non-overlapping definitions of coal and "marsh gas." See, e.g., THE UNIVERSAL ENCYCLOPAEDIC DICTIONARY 945 (1905) (defining "coal" as "a stratified rock"); id. at 2637 (defining "marsh gas" as "a hydrocarbon gas very abundant in nature"). These works demonstrate a commonly understood difference between marsh gas released as a consequence of coal mining and the coal itself. The fact that Congress understood coal to be a solid, understood that marsh gas existed as a gas, and did not mention marsh gas in the statutes, persuades me that they did not mean to include CBM when they said "coal."
 
 B.
 1.
 
 71
 Two further points support my plain-meaning interpretation of the term "coal." The first involves the uses to which coal and CBM were put in 1909 and 1910. As the district court noted, coal--that is, the solid material--was the nation's primary energy resource in the early twentieth century. See Southern Ute Indian Tribe, 874 F.Supp. at 1149. Coal was the driving force behind this country's transition from an agrarian economy to an industrial economy. See id. Coal, the solid, heated our nation's homes and played an indispensable role in the production of steel. The importance of the mineral to our nation cannot be overstated. Marsh gas, to the contrary, was considered a waste product. As I have said, miners knew of it because it was a danger to their lives, but the gas had no economic value at the time.
 
 
 72
 In the early 1900s, a "coal famine" struck the West. That shortage in supply led to government investigations and the discovery that many had fraudulently procured land that was rich in coal. This discovery, in turn, prompted President Roosevelt to withdraw vast amounts of land from the homesteading process and ultimately led to the passage of the Coal Lands Acts. In reserving coal to the federal government, Congress was attempting to manage and conserve the country's most important resource--the solid rock coal--not the waste by-product coalbed methane. When examined against the backdrop of the early twentieth century, the majority's interpretation that Congress may have thought "coal" also included CBM, an unused and unusable gas, seems extremely artificial.
 
 
 73
 One of the plaintiff's own experts said in a report that pre-dates this action:
 
 
 74
 Coal has classically been regarded as a solid fuel.... [I]n terms of its conventional usage, coal is considered to be a (solid) rock which could be burned and utilized as an energy resource. Based upon this definition, utilization of the energy potential of a coal bed would necessarily entail the mining of the coal and removal to the surface, during which process most of the entrapped methane would be released. The residual "solid" is what would be conventionally regarded as "coal", to the exclusion of any escaped gases that were originally present underground.
 
 
 75
 Applt. App. at 1602, 1604 (Report of Jeffrey R. Levine, Ph.D.) (emphasis added) (parentheses in original).[1] This classical understanding of coal dated back at least to 1909.
 
 
 76
 Without explanation, the majority contends that the fact that CBM was useless in 1909 makes the statute ambiguous as to CBM. See Maj. Op. at 1261 ("[W]here the commercial value of CBM was unappreciated at the time of the enactment, the text of these acts gives us no particular indication of Congress' specific intent with regard to that asset."). I draw quite the opposite conclusion. CBM was a waste product in 1909. Its ownership not being desirable, one would not expect the United States to reserve it. Because a reservation of CBM would go against expectations, that would make it more, rather than less, imperative for the government to mention the gas in its reservation of coal. Thus, the fact that CBM had no value confirms the plain meaning, rather than creating an ambiguity.
 
 
 77
 The text of the majority opinion just quoted from not only fails to convince me that CBM's lack of value creates an ambiguity, it also points back to the majority's central interpretive error. The passage suggests that because the statute does not refer to CBM, it is ambiguous with regard to CBM. Earlier in its opinion, the majority states explicitly that the 1909 and 1910 Acts do not "mention CBM; thus, the statutes do not by their plain language indicate congressional intent regarding CBM." Maj. Op. at 1258. Likewise, the 1909 and 1910 Acts do not mention the Holy Grail, the Hope Diamond, or my left shoe. Yet I doubt that if any of these items were found within a coalbed reserved by the United States in 1909 and 1910, one would conclude that they might actually be "coal." Silence does not equate with ambiguity.
 
 2.
 
 78
 Secondly, coal retains all of its economic value after the natural release of the methane.[2] This too was commonly understood in 1909. That CBM has no effect on the uses of coal highlights the independence of the two minerals. Contrast CBM's presence within coal and that of water's presence within coal. Some water is always present inside coal. It forms hydrogen bonds with the coal. These bonds are much stronger than those that bind CBM to the surface of the coal. The presence of water in coal affects the economic value of coal; the drier coal is, the better it burns--the less water in coal the better. That water affects coal's ability to create energy--its distinguishing characteristic in our society--creates a question as to whether it is actually part of the coal or not. No such ambiguities, however, exist for CBM. Regardless of how much CBM is trapped in or on coal, the coal's value is unchanged. I reemphasize that this was commonly understood in 1909.
 
 C.
 
 79
 I cannot fail to mention that the court's reading of the word "coal" as ambiguous controverts its plain meaning in at least one additional respect. Much of the CBM in a coal deposit--over 90 percent according to the record--strays from the coalbed over time. It escapes into nearby rock such as sandstone or shale. This too was commonly understood in 1909. The majority states that its opinion applies only to the CBM that remains within the coalbed. See Maj. Op. at 1260 n. 8. The majority's reluctance to address CBM that has escaped from the coalbed is understandable, because doing so reveals the conflict between the classical understanding of "coal" and the result reached in this case. If the majority were to declare that the 1909 Congress did not think of escaped CBM as coal--an entirely correct declaration--it would find itself in the uncomfortable position of saying that Congress might have thought that some CBM is coal (i.e., the CBM trapped in coal deposits), but that some CBM definitely is not coal (i.e., the escaped CBM), even though there is no chemical difference between the two groups of CBM. The only difference between the two is dumb luck. In the formation of the coalbed and surrounding rock, some methane was captured by the coal and some was not.
 
 
 80
 If the majority were being true to its own reasoning, it would find that Congress's use of "coal" in 1909 is also ambiguous with respect to the CBM that escapes into nearby rock. That conclusion, however, exposes bare the chasm between the traditional understanding of "coal" and today's result. No one attuned to the common understanding of coal, either today or in 1909, would say that sandstone that has been penetrated by methane that originated in a coalbed contains "coal."
 
 II.
 A.
 
 81
 The majority rejects the plain meaning analysis for two reasons, neither of which is persuasive. First, the court asserts that the 1909 Congress may have thought CBM was part of the solid rock. See Maj. Op. at 1260 ("[T]here was enough undisputed information about the unique nature of CBM to indicate that even if Congress intended to retain only solid rock coal, Congress in 1909 may have considered CBM to be part of that solid coal."); id. at 1260 ("Although CBM in a gaseous state can be produced from coal, prior to that production most CBM is not sufficiently like other natural gases for us to conclude that Congress in 1909 unambiguously intended the owners of other natural gases to also own CBM associated with the reserved coal."); id. at 1261 ("CBM is so intimately associated with coal that Congress in 1909 could have considered it part of the solid rock."). The majority does not identify the "undisputed information" or the "unique" properties of CBM upon which it relies for its conclusion. Apparently, the distinction between CBM and other natural gases that the majority finds important is the fact that other gases expand indefinitely, while CBM (that is, the portion of the CBM that remains with the coal deposit) is either trapped inside air pockets in the coal or attached to smaller fractures or pores on the surface of the coal. I fail to discern the legal difference that these features of CBM make.
 
 
 82
 The fact that some of the gas is trapped in the coal, and therefore does not expand indefinitely, cannot be the decisive factor. Gas becomes trapped in sandstone, shale, and other rocks, and yet we still consider it gas. In fact, this is exactly what happens to the CBM that escapes from the coalbed. It becomes trapped in adjacent rock. See Jeff L. Lewin, et al., Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane, 94 W. VA. L.REV. 563, 573 (1992). There is nothing unique about gas being trapped in a rock. Likewise, when gas is released from the ground, it must be trapped in containers in order to be made useful. Nonetheless, we do not say that a tank of natural gas is not gas, merely because it is not expanding indefinitely. In order to be a gas, an element must possess "the ability to expand indefinitely." See Maj. Op. at 1260 n. 9 (quoting RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 550 (1995)) (emphasis added). No one would dispute that CBM possesses that characteristic. See, e.g., Applt. App. at 1609 (Report of Jeffrey R. Levine, Ph.D.) ("In a gaseous state methane behaves very nearly as an 'ideal' gas, meaning that it exhibits very little attractive forces between molecules, and its behavior conforms fairly closely with the 'Ideal Gas Law.' ").
 
 
 83
 Similarly, the fact that some gas attaches to the smaller "micropores" on the surface of the coal cannot be a basis to believe that the 1909 Congress may have thought the gas was part of the solid rock. As the majority points out, a process known as "adsorption" or "sorption" causes some CBM to collect in pores on the surface of the coal. There are two types of sorption: physical sorption and chemical sorption. The sorption process relevant to this case is physical sorption. Physical sorption occurs between gases of all types and solids. The gas is held close to the coal's surface area by weak forces known as van der Waals forces. According to the plaintiff's expert, van der Waal's forces occur "between most any pair of substances." Applt. App. at 1687. The forces are so weak that neither the gas molecules nor those on the surface of the solid are chemically altered. The deposition of one of the plaintiff's experts reveals the pervasiveness (and weakness) of van der Waals forces:
 
 
 84
 Q. If I put this paper on the table, is the bottom page bound to the table by van der Waals forces?
 
 
 85
 A. To a certain degree, yes.
 
 
 86
 Q. Is it part of the table?
 
 
 87
 A. No, it is not.
 
 
 88
 Applt. App. 1694. The van der Waals forces that hold the gas to the surface have been likened to gravity--it keeps us on the ground but does not make us part of mother earth.
 
 
 89
 In contrast, when chemical sorption occurs, actual chemical bonds form between the gas and the solid. This leads to an irreversible change in the chemical properties of both the gas and the solid. Physical sorption, unlike chemical sorption, can be reversed; the sorbed gas can be removed from the solid by the simple reduction of pressure.
 
 
 90
 Although the majority uses suggestive rhetoric in stating that CBM has a "unique nature," id. at 1260, that it is "molecularly attracted to coal," id. at 1260, "intimately associated with coal," id. at 1261, and an "integral component of coal," id. at 1261, it does not actually identify a reason to believe that the physical sorption of CBM makes it part of the coal, or that the 1909 Congress believed that it was part of the coal. The physical sorption of CBM in coal--to the ordinary understanding--is much like the retention of water in a sponge. And yet we do not believe, merely because of the "intimate association" between the water and the sponge, that they have become one and the same. Instead, we conceive of the liquid water and the solid sponge as two distinct items. There is nothing about the process of physical sorption--which occurs as a result of universal van der Waals forces and is reversible upon the mere reduction of air pressure--that leads me to conclude that the ordinary and traditional understanding of coal should be abandoned. In fact, it confirms that "coal" does not include CBM.
 
 
 91
 The crux of the majority's argument is that the understanding of CBM and coal in 1909 was inconclusive enough that Congress may have intended to reserve CBM when it reserved coal. In footnote twelve, the majority presents a different and far bolder argument--which is nonetheless wrong also. Rather than arguing that the scientific information available in 1909 created an ambiguity with regard to CBM, the majority in footnote twelve states that scientists in 1909 actually understood CBM to be part of coal. The majority offers one quotation in support of that statement: "The ultimate source of the gases [within coal] ... has arisen from the slow decomposition of organic matter as a by-product in the process which has converted vegetable humus into coal." Rollin T. Chaimberlain, Notes on Explosive Mine Gases and Dusts, U.S. Geol. Surv. Bull. 383, H.R. DOC. NO. 1583, 60th Cong., 2d Sess., at 16 (1909). The majority's belief that this statement supports its position highlights the error of its ways. This source clearly identifies CBM as a by-product of coal. A by-product is something separate, secondary, or additional to the principal product from which it came. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 307 (1981). A "byproduct" of coal is far different from an "integral component" of coal, as the majority describes CBM at another part of the opinion. Maj. Op. at 1261. This quotation creates no ambiguity as to the ordinary meaning of "coal," nor does it indicate that scientists actually believed CBM was part of coal, though it does create an ambiguity in the majority's rationale. In fact, this quotation supports my position that the scientists of 1909 understood coal and CBM to be separate and distinct.
 
 
 92
 Other sources directly conflict with the majority's assertion that CBM was considered part of coal in 1909. For instance, only fifteen years after the passage of the first Coal Lands Act, scientists were saying:
 
 
 93
 What we know about the chemistry of coal is almost negligible. It is true that chemists have considerable knowledge of the products of distillation, but probably none of those substances are to be found in coal as such.
 
 
 94
 REINHARDT THIESSEN, THE ORIGIN AND CONSTITUTION OF COAL 3 (1924).
 
 B.
 
 95
 The other fact that the majority relies on in rejecting the plain meaning of "coal" is that in 1909-10, there was no process by which CBM could be extracted from coal and captured without damaging or destroying the coal. Apparently, CBM could not be captured without actually removing the coal from the earth and crushing it in an airtight receptacle. Assuming this to be true, it should make no difference in our interpretation of the statute.
 
 1.
 
 96
 The majority's reliance on the lack of extraction technology demonstrates that it has conflated two very different questions. The majority concludes that because CBM could not be mined without destroying the coal, the coal owner must also have owned the CBM. Even in 1909, however, the common law on split mineral estates distinguished between the questions of (1) who owns a mineral under the ground, and (2) the extent to which the owner can interfere with the property rights of another to extract his mineral.
 
 
 97
 For instance, in Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597 (1893), the surface owner had granted the right to the coal under his land to the plaintiff, Chartiers Block. Subsequently, the surface owner realized that valuable oil and gas lay beneath the coal. Thus, the surface owner made leases for that oil and gas, and the lessees began to drill for it, intending to drill wells through the coal stratum. Chartiers Block sought an injunction on two grounds: (1) the lessees had no right to the minerals under the coal, and (2) even if they did, they could not drill through the coal to access the oil and gas because the lessees' mining operations would destroy the value of the coal. See id. at 597. The structure of this challenge reveals that the plaintiff recognized the distinction between ownership of a mineral and the right to extract it. The Pennsylvania Supreme Court's decision confirms that the law recognized the distinction even in 1893.
 
 
 98
 The court first easily rejected the notion that the owner of the coal estate had any rights to the underlying oil and gas merely because the lessees had to penetrate the coal to get to it. See id. at 599 ("The grantee of the coal owns the coal, but nothing else ....") (emphasis added); id. ("The position that the owner of the coal ... may forever prevent the surface owner from reaching underlying stratum, has no authority in reason, nor, do I think, in law."). Whether or not the oil and gas mining would destroy the value of the coal was immaterial to the prior question of who owned the oil and gas. The court ruled that the lessees could drill through the coal to get to their gas and oil, provided that they did not inflict unreasonable damage to the coal. See id. (finding that the lessees have a right of access but that "the right may be suspended during the operation of the removal of the coal to the extent of preventing any wanton interference with the coal mining.").
 
 
 99
 In reaching its conclusion, the court clearly distinguished between mineral ownership rights and the right to extract that mineral.
 
 
 100
 [W]hen the owner of the surface parted with the underlying coal, he parted with nothing but the coal. He gave no title to any of the strata underlying it, and it is not to be supposed for a moment that the grantor parted with or intended to part with his right of access to it.... The only question is how that right shall be exercised, by what authority, and under what limitations.
 
 
 101
 Id. Accordingly, the court said that "[t]he right of the surface owner to reach his estate below the coal exists at all times. The exercise of it may be more difficult at some times than at others." Id. (emphasis added). Thus, Chartiers Block stands for at least two propositions. The first is that the surface owner who has granted coal right to another retains title in everything but the coal. The second is that the surface owner can extract the minerals that he owns as long as he does not unreasonably damage the coal. These principles remain part of the common law today. See, e.g., Notch Mountain Corp. v. Elliott, 898 P.2d 550, 556 (Colo.1995) (en banc) (stating that owner of mineral estate may make reasonably necessary use of the surface owner's land to extract minerals).
 
 
 102
 If the majority is correct in asserting that CBM could not be extracted in 1909 without destroying coal, that does not lead to the conclusion that the surface owner did not own the CBM. At most, it means that the surface owner could not immediately mine for CBM because mining would have led to unreasonable damage to the coal. See Chartiers Block, 152 Pa. at 297 ("The most that can be claimed is that, pending the removal [of the coal, the plaintiff's] right of access to the lower strata is suspended."). The majority is incorrect in finding that the inability to extract CBM from coal without damaging the coal determines the separate ownership question.[3]2.
 
 
 103
 The majority's reliance on the lack of CBM-extraction technology to conclude that Congress may have thought of CBM as an integral part of coal also reveals an unresolvable internal conflict in the majority's reasoning, specifically between parts II.B. and II.C.2 of its opinion. In Part II.B, the majority concludes that the 1909 Congress's specific intent with regard to CBM is ambiguous. In so concluding, the majority relies on the fact that in 1909, it was technologically impossible to separate CBM from coal without destroying the coal. See Maj. Op. at 1261 ("It is not reasonable to impute to Congress a desire to retain only solid rock coal ... when CBM is an integral component of coal and in 1909 there appears to have been no technology by which a patent holder could extract and capture CBM from coal without damaging or destroying the coal."). The majority argues, in short, that the lack of technology shaped the way Congress thought about coal and CBM in 1909.
 
 
 104
 In Part II.C.2, however, the majority reverses its position completely. Seeking to explain Congress's "general intent," the majority finds that Congress intended to capture the entire future value of the coal that it reserved. Therefore, the court, in putting forth its case that CBM is part of the economic value of coal, relies on an assertion that Congress knew there would be technological advances in the coal mining field, and that Congress intended to take advantage of those technological advances. See Maj. Op. 1265 ("Congress adopted an interpretation of coal which encompassed both the present and future economic value of coal for energy purposes, including value that could only be realized through advances in technology such as those which drive the present day exploration for CBM."). The majority never explains how it can state that the lack of technology in 1909 shaped Congress's view of CBM, and yet later rely on the fact that Congress anticipated technological advances to explain how Congress thought about CBM. If Congress anticipated technological advances such as those that make CBM mining possible today, the lack of mining technology in 1909 should not have had any effect on its ability to conceive of CBM and coal as two separate entities.
 
 
 105
 I agree that the 1909 Act envisioned technological advances affecting the coal mining industry. Thus, as the majority points out, Congress reserved to itself coal that was not economically useable in 1909 and 1910. Nonetheless, that does not change the fact that there is a limit on the natural and plain meaning of the term coal. The meaning of coal does not include CBM, regardless of technologies that make it available or unavailable.
 
 III.
 
 106
 In 1909, people thought of gases and solids as separate entities. Their understanding was no different with regard to the relationship between coalbed methane--a dangerous gas emitted from coal mines--and coal itself. Coal, as used in the Coal Lands Acts of 1909 and 1910, has a plain meaning that does not include CBM. The majority attempts to create an ambiguity through analysis of the scientific process that keeps some of the CBM layered on the solid coal. For the reasons stated above, that analysis confirms the plain understanding rather than contradicting it. Because I find no ambiguity in the statute, I see no reason to invoke the rule that calls for interpreting ambiguities in a federal reservation in favor of the government.
 
 
 107
 I respectfully dissent.
 
 
 108
 ANDERSON and BALDOCK, Circuit Judges, join in this dissent.
 
 
 
 *
 Judge Wade Brorby, Judge David M. Ebel, Judge Carlos F. Lucero, and Judge Michael R. Murphy are recused in this case
 
 
 [1]
 The district court certified its judgment for immediate appeal under Fed.R.Civ.P. 54(b)
 
 
 [2]
 The federal defendants did not petition for rehearing en banc. Nevertheless, they filed a supplemental brief on rehearing which clarified their position as follows:
 In the proceedings before the panel in this case, the federal appellees' brief primarily addressed specific federal defenses relating to the Tribe's breach of trust claim. See Brief for the Federal Appellees 28-45. On the question of whether the Coal Land Acts of 1909 and 1910 reserved CBM, the federal appellees adopted the answer brief filed by Amoco Production Company. See id. at 28, 30. The brief of Amoco Production Company specifically contended, among other arguments, that the term "coal" is not ambiguous and means "the solid rock." Brief for Amoco Production Co., at 12-26. We submit this response to clarify the federal appellees' position in two respects.
 First, although the federal appellees endorsed the arguments set out in the Amoco Production Company's brief, that endorsement does not signify a view that the question of CBM ownership should necessarily be resolved merely by reference to the meaning of the term "coal." Rather, the federal appellees' view on the ultimate issue of CBM ownership rested on the analysis set forth in the May 12, 1981, opinion of the Solicitor of the Interior, which concluded, for the reasons stated therein, that the Coal Land Acts of 1909 and 1910 did not reserve CBM. See Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits, 88 I.D. 538 (1981). The panel decision of this Court considered and rejected the Solicitor's analysis. See 119 F.3d at 834-836.
 Second, the panel decision of the court has prompted the Solicitor of the Interior to commence a review of the analysis set out in the May 12, 1981, Solicitor's opinion. See, e.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 863-864, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (noting that an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis"). That review is ongoing and could conceivably result in a modification of the views expressed therein.
 Response for Federal Aplees at 3-4.
 
 
 [3]
 In full, the Act as originally titled and promulgated was as follows:
 Chap. 270.--An Act For the protection of the surface rights of entrymen.
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That any person who has in good faith located, selected, or entered under the nonmineral land laws of the United States any lands which subsequently are classified, claimed, or reported as being valuable for coal, may, if he shall so elect, and upon making satisfactory proof of compliance with the laws under which such lands are claimed, receive a patent therefor, which shall contain a reservation to the United States of all coal in said lands, and the right to prospect for, mine, and remove the same. The coal deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal-land laws in force at the time of such disposal, but no person shall enter upon said lands to prospect for, or mine and remove coal therefrom, without previous consent of the owner under such patent, except upon such conditions as to security for and payment of all damages to such owner caused thereby as may be determined by a court of competent jurisdiction: Provided, That the owner under such patent shall have the right to mine coal for use on the land for domestic purposes prior to the disposal by the United States of the coal deposit: Provided further, That nothing herein contained shall be held to affect or abridge the right of any locator, selector, or entryman to a hearing for the purpose of determining the character of the land located, selected, or entered by him. Such locator, selector, or entryman who has heretofore made or shall hereafter make final proof showing good faith and satisfactory compliance with the law under which his land is claimed shall be entitled to a patent without reservation unless at the time of such final proof and entry it shall be shown that the land is chiefly valuable for coal.
 Law of Mar. 3, 1909, ch. 270, 35 Stat. 844 (current version at 30 U.S.C. § 81).
 
 
 [4]
 The 1910 Act, as originally titled and enacted, provided in relevant part:
 CHAP. 318.--An Act To provide for agricultural entries on coal lands.
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That from and after the passage of this Act unreserved public lands of the United States exclusive of Alaska which have been withdrawn or classified as coal lands, or are valuable for coal, shall be subject to appropriate entry under the homestead laws by actual settlers only ... with a reservation to the United States of the coal in such lands and of the right to prospect for, mine, and remove the same....[A]ll homestead entries made hereunder shall be subject to the conditions, as to residence and cultivation, of entries under the Act approved February nineteenth, nineteen hundred and nine, entitled "An Act to provide for an enlarged homestead:" Provided, That those who have initiated non-mineral entries, selections, or locations in good faith, prior to the passage of this Act, on lands withdrawn or classified as coal lands may perfect the same under the provisions of the laws under which said entities were made, but shall receive the limited patent provided for in this Act.
 ....
 SEC. 3. That upon satisfactory proof of full compliance with the provisions of the laws under which entry is made, and of this Act, the entryman shall be entitled to a patent to the land entered by him, which patent shall contain a reservation to the United States of all the coal in the lands so patented, together with the right to prospect for, mine, and remove the same. The coal deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal-land laws in force at the time of such disposal. Any person qualified to acquire coal deposits or the right to mine and remove the coal under the laws of the United States shall have the right, at all times, to enter upon the lands selected, entered, or patented, as provided by this Act, for the purpose of prospecting for coal thereon upon the approval by the Secretary of the Interior of a bond or undertaking to be filed with him as security for the payment of all damages to the crops and improvements on such lands by reason of such prospecting. Any person who has acquired from the United States the coal deposits in any such land, or the right to mine or remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining and removal of the coal therefrom, and mine and remove the coal, upon payment of the damages caused thereby to the owner thereof, or upon giving a good and sufficient bond or undertaking in an action instituted in any competent court to ascertain and fix said damages: Provided, That the owner under such limited patent shall have the right to mine coal for use upon the land for domestic purposes at any time prior to the disposal by the United States of the coal deposits; Provided further, That nothing herein contained shall be held to deny or abridge the right to present and have prompt consideration of applications to locate, enter, or select, under the land laws of the United States, lands which have been classified as coal lands with a view of disproving such classification and securing a patent without reservation.
 Law of June 22, 1910, ch. 318, §§ 1, 3, 36 Stat. 583-84 (current version at 30 U.S.C. §§ 83, 85).
 
 
 [5]
 "Occluded" was defined contemporaneously as "To take in and retain; to absorb." WEBSTER'S REVISED UNABRIDGED DICTIONARY 994 (G & C Merriam Co., 1913 ed.)
 
 
 [6]
 Any modern-day dispute regarding the exact nature of CBM and whether it is a separate gas or is part of coal is irrelevant to our task, and we do not resolve that issue here. For a general discussion of the difficulty of deciding ownership of CBM even today, see Jeff L. Lewin et al., Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane, 94 WEST VA. L.REV. 563 (1992)
 
 
 [7]
 Adsorption is "adhesion in an extremely thin layer of molecules ... to the surfaces of solid bodies or liquids." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 16 (10th ed.1993)
 
 
 [8]
 At issue here is the ownership of CBM trapped in and produced from the coal reservoir. We do not address ownership of CBM that may have migrated away from the coal into adjacent non-coal strata. Determining the relative proportions of CBM produced from coal and non-coal strata is an issue which must be resolved on remand
 
 
 [9]
 A gas is "a fluid substance with the ability to expand indefinitely." THE RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 550 (1995)
 
 
 [10]
 Adsorbed CBM, which comprises most of the "gas" within coal, can be economically produced only by techniques which artificially induce changes in the coal reservoir. See, e.g., Lewin, supra note 4, at 573, 576-583 (discussing vertical-borehole-induced pressure changes, hydrofracturing, and horizontal drilling)
 
 
 [11]
 The dissent claims the relationship between adsorbed CBM and coal in the ground is no different than that between a piece of paper and the table it is lying on. Dissent at 1271. However, the piece of paper would not have to be destroyed in order to move the table to a usable position, unlike the CBM adsorbed in the coal in 1909; nor would the table have to be destroyed in order to take the paper off and preserve it, unlike the coal in 1909 with respect to the adsorbed CBM. The same is, of course, true with respect to the sponge and water analogy used by the dissent. Id. at 1271-1272
 
 
 [12]
 In fact, by 1909, scientists understood that gas within coal was a constituent of coal which was generated by the coalification process. See Rollin T. Chamberlin, Notes on Explosive Mine Gases and Dust, U.S. Geol. Surv. Bull. 383, H.R. DOC. NO . 59-823, at 16 (1909) ("The ultimate source of the gases [within coal] ... has arisen from the slow decomposition of organic matter as a by-product in the process which has converted vegetable humus into coal.")
 
 
 [13]
 Congress almost certainly knew in 1909 that gas could be extracted from coal. The coal degasification practiced in 1909 was, however, a different process than the CBM drilling at issue in this case. Coal degasification required mining and extraction of coal, which released some of the gas, then releasing the remaining gas by mechanically crushing the coal in an airtight receptacle, Chamberlin, supra note 9, at 17, or heating it, id. at 39; LARRY L. ANDERSON & DAVID A. TILLMAN, SYNTHETIC FUELS FROM COAL § 3.1.1, at 31 (1979). Because these processes of degasification necessarily resulted in damage to or destruction of the coal, they could only be employed by the owner of the coal. Accordingly, the value of the gas extracted necessarily belonged to the coal owner. CBM drilling, on the other hand, for the first time allows CBM to be released from coal and captured without bringing large volumes of coal to the surface. The technique is typically employed where the coal is deeply buried and thinly bedded and cannot be economically mined. The advent of the drilling technologies employed today to extract CBM while leaving most of the coal relatively undisturbed, cf. Lewin, supra note 4, at 593-597 (the primary concern with CBM drilling is in situ damage to coal reserves), creates an apparent conflict in ownership of CBM that did not exist in 1909 and 1910
 
 
 [14]
 The opinion in Hoge is ample response to the dissent's assertion that it is illogical to distinguish in ownership between CBM adsorbed in coal and CBM that has migrated. See dissent at 9 (the only difference between "trapped" CBM and "escaped" CBM is "dumb luck")
 
 
 [15]
 The dissent finds it anomalous that we rely on Congressional recognition of advancing technology in coal mining to support our conclusion. We, in turn, find anomalous the dissent's position that when Congress reserved in 1909 and 1910 "all coal and the right to ... mine, and remove the same" it unambiguously intended to give away to a homesteader on lands valuable for coal a hazardous product required at the time to be vented off and wasted in order to safely mine the coal
 
 
 [16]
 Moreover, we cannot believe that Congress would have countenanced ceding CBM to surface patentees, see infra note 12, knowing that degasification at the time would have involved damage to and possibly destruction of the very resource sought to be reserved. See supra note 10
 
 
 [17]
 "Surface patent" is used throughout this opinion to indicate the surface estate patented to agricultural entrants under the 1909 and 1910 Acts, which estate included all minerals other than coal
 
 
 [18]
 In 1955, to aid exploration and extraction of uranium and other source materials in coal reserved to the United States by the 1909 and 1910 Acts, Congress enacted legislation to control "Entry and Location on Coal Lands on Discovery of Source Material." 30 U.S.C. §§ 541-541i (hereinafter the 1955 Act). The Amoco defendants consider the legislative history of the 1955 Act relevant to our determination of CBM ownership. We are not persuaded Amoco's interpretation of the legislative history of the 1955 Act is the only interpretation the enactment will bear. In any event, Congress' allocation of the right to extract uranium in coal cannot be equated to the CBM at issue in this case because uranium is not invariably included in coal as part of the coalification process and because the 1955 Act does not purport to apply to nonfederal lands
 Amoco also relies on a 1933 House of Representatives' report to suggest that Congress has recognized dual ownership between the United States and agricultural patent holders when reserved minerals are found commingled with unreserved minerals. Amoco En Banc Br. at 47 (citing H.R. REP. NO. 72-1938, at 2 (1933)). The House report and the subsequently enacted 1933 Act, which consolidated in the United States ownership of commingled sodium and potash, 30 U.S.C. § 124, do not particularly inform us about the 1909 and 1910 coal reservations, and certainly do not persuade us to ignore our mandate to resolve doubts and ambiguities in the 1909 and 1910 coal reservations in favor of the sovereign.
 
 
 [19]
 Our reversal will require the district court to address the defenses asserted by defendants to preclude recovery by the Tribe, at least some of which appear to raise issues of serious magnitude
 
 
 [1]
 This document was originally produced in the district court and was subject to a Protective Order governing confidential documents in this case. Without objection, the appellants included this report in the public record on appeal. Therefore, we cite to it. All other documents produced in this case remain subject to the confidentiality provisions of the Protective Order
 
 
 [2]
 The following exchange occurred in the deposition of the plaintiff's expert:
 "Q. Is there any use that you can think of to which coal--which is made of coal which cannot be made after methane is removed from it?"
 "A. I can't think of any at this time."
 Applt. App. at 1685.
 
 
 [3]
 The majority responds to our discussion of the distinction between ownership rights and extraction rights, and Chartiers Block in particular, by noting that ninety years after that decision, the Pennsylvania Supreme Court decided in United States v. Hoge, 503 Pa. 140, 468 A.2d 1380 (Pa.1983) that a private deed granting coal included a grant of CBM. Hoge is inapposite for two reasons. First, it does not in any way call into doubt Chartiers Block 's distinction between ownership and extraction rights, the point for which I cited it. Second, Hoge interprets a deed rather than a federal reservation of a mineral. Interestingly, the original panel opinion in this case explains why a state case about a common law deed, like Hoge, is irrelevant to this appeal:
 The [parties] have cited state court cases which have considered ownership of CBM. As interesting as these cases are (four of five deciding ownership of CBM is in the coal owner), they are not dispositive of the case at bar. The state cases construe CBM ownership in the context of common law deeds, which are negotiated conveyances with specific rules and presumptions of construction. These cases ultimately have little to offer in terms of our interpretation of Congressional intent in the 1909 and 1910 Acts.
 See Southern Ute Indian Tribe v. Amoco, 119 F.3d 816, 828 n. 17 (10th Cir.1997). Notwithstanding the majority's marked reversal on the importance of the state cases, the Hoge opinion itself demonstrates why it has "little to offer" in this appeal. For instance, Hoge relies on the common law rule that "as a general rule, subterranean gas is owned by whoever has title to the property in which the gas is resting." Hoge, 468 A.2d at 1383. Also, in discerning the intent of the parties to the instrument, the Hoge court worked on the premise that the parties intended to reserve only those minerals which were "generally known to be commercially exploitable." Id. at 1385. Although I ultimately disagree with the majority's result, I do agree with them that the government's intent in this case was not merely to reserve coal that was commercially exploitable in 1909-10. Thus, Hoge and the other state cases present different inquiries and different rules of construction than those at work in this case. Thus, as the panel said the first time around, they have extremely limited value here.